GABRIEL GONZALEZ
#3515-112
P.O. BOX 9000 - LOW
FORREST CITY, ARKANSAS
72936

CLERK OF THE COURT
600 W. CAPITOL AVE. SUITE A-149
LITTLE ROCK, ARKANSAS 72201

RECEIVED
U.S. DISTRICT COURT

2021 MAR -5 A 9 44

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 05 2021

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

RE: CASE # 2:20-CV-00083-BSM-JTK

DEAR CLERK OF THE COURT,

THIS BRIEF WAS RETURNED TO ME, FOR REASONS UNKNOWN, ON 3/02/21. I AM FORWARDING THIS TO YOU BECAUSE IT WAS ORIGINALLY MAILED ON 1/23/20. I HAVE INCLUDED THE ORIGINAL MAILING ENVELOPE WHICH SHOWS THIS PARCEL SOMEHOW ENDED UP IN CALIFORNIA. THE STAMPS WERE REMOVED BY PERSONS UNKNOWN IN THE PRISON'S MAILROOM.

GONZALEZ IS AWARE THAT THE COURT HAS ASKED HIM TO REFRAIN FROM FURTHER FILING SUBMISSIONS. THIS IS NOT AN ATTEMPT TO DO SO. THIS WAS FILED PRIOR TO SERVICE OF THAT ORDER.

I CERTIFY THE FOREGOING TO BE TRUE AND CORRECT.

GABRIEL GONZALEZ
PLAINTIFF, PRO SE

United States District Court
Eastern District of Arkansas
Delta Division

Gabriel Gonzalez
Plaintiff, Pro Se

                                                    Case Number
                                                    2:20-CV-00083-BSM-JTK

v.


DeWayne Hendrix, Warden
Respondent


Brief in support of § 2241 Motion


        Gabriel Gonzalez asks this honorable court to accept this brief and to consider

the additional points and facts presented with his previously submitted litigation.

        This brief is made to incorporate information relevant and significant to

the execution of sentence issues brought forth in this litigation.  The information

and exhibits presented are relevant because they further support and demonstrate

the veracity of the claims set forth in Gonzalez' original petition.  The information

is significant because the cogency and character of these facts cast a truly mephitic

befouling of our traditional notions of just punishment and these transgressions

may well be determined as an affront to the integrity of our noble justice system.


**Discussion**


I.        **The BOP engaged in a clandestine research project using its prisoners as**
          **human research subjects in order to examine the pathology of the SARS-CoV-2**
          **virus.**


        a.   The Morbidity and Mortality Weekly Report (MMWR) is a publication produced

by the Center for Surveillance, Epidemiology and Laboratory Services, the Centers

for Disease Control and Prevention (CDC), and the U.S. Department of Health and

Human Services.  This section draws information and facts from the MMRW vol. 69, No. 33 published 8/21/20.  (Exhibit 1 (in part)).

From the inception of the U.S. SARS-CoV-2 (COVID-19) endemic, the BOP and CDC have united efforts to observe, research, and study the presence, proliferation, and vectorial attributes of the disease in populations believed to be at greater risk and vulnerability to contracting, transmitting, or experiencing severe injury or death from exposure to the contagion.  These populations include, but are not limited to; Nursing Homes for the elderly, federal prisons and some State jail facilities, and to workplace outbreaks involving the manufacturing and production industry sectors. The latter category was also studied for racial and ethnic disparities found amongst those various sectors.


b.    On 3/31/20 the prison at FCI Forrest City, including other prisons within the sphere of the BOP, were locked-down in response to the burgeoning viral spread within the prison's network of facilities.

In April/May 2020, FCIFC began construction of M.A.S.H.-style Haz-Mat tents, portable ventilation systems, trailered shower units, and a variety of other extemporary fabrications and facilities to accommodate their model scheme to observe and explore the spread of SARS-CoV-2 amongst the prison population.

On May 13, 2020 Gonzalez, and others similarly situated, were administered a Nasopharyngeal exam by CDC personnel.  This was done in lieu of being placed among the hordes of COVID-19 infected prisoners held in other areas of the prison.  Reassignment to infected quarters was the standard response for those who refused to participate in the "voluntary" testing.  (Exhibit 2).

After reportedly testing positive, on May 20,2020 Gonzalez was placed in a dormitory with other infected prisoners.  During the course of his stay, up to and including the present date, Gonzalez remains in quarantine and has repeatedly requested to be given medical treatments, examinations, and pharmaceuticals for his COVID-19

symptoms.  (see previously submitted Health Services email request exhibits).  These symptoms have included many of those symptoms listed on the CDC's chart of COVID-19 related symptoms.  Gonzalez has filed several formal sick-call requests seeking care for his infection.  To date, Gonzalez is still waiting for his requested care. The only care he has received has been the 3 weeks of community temperature charting performed in May and June, 2020.  These daily checks were ultimately eliminated en masse for his housing unit after the first few weeks.

Gonzalez still suffers enduring physiological decline due to his COVID-19 infection and forced participation in the BOP/CDC study program.  He fears he is likely to incur permanent injury as a result of his mistreatment and progression of his infection(s) despite his efforts to self-treat his symptoms.

c.  The prevalent theme of this study appears to center on frequency of testing practices as it relates to prevention and mitigation planning.  This could explain why it was necessary for the prison to arrange multiple quarantine sites, each having its own unique set of characteristics, while layering (or withholding) intervals of care, monitoring the progression of infections, or other observational study activities performed upon the various groups of inmates.  But, even the MMWR writes critically about how prisoners, as a class, were placed in peril by this study project. The author opines:

> "Additional studies should examine whether timing of mass testing influences its effectiveness in facilitating outbreak containment."

This very opinion is made apparent in comparison with the disparate testing that was offered to the residents of the nursing facilities.

The author shows by reference that the collateral study "involving five Health Department jurisdictions that conducted facility-wide testing in 88 nursing homes that had already identified at least one case." (showing a 1.0/ratio of infections).

The findings from this collateral study concluded that "facility-wide testing early in an outbreak can be an effective mitigation strategy." This is because the early mass testing was observed to have quelled further infection resulting in a 1.3/ratio of infections using mass testing protocols. (MMWR/Aug. 21, 2020/ vol. 69/No. 33, p.1141).

Sadly, this finding supports the conclusion that prisoners were specifically selected for exclusion from receiving mass testing using these readliy available test kits, but were instead used as human guinea pigs, left to suffer the natural course of the disease made inescapable by their incarceration and by the prison's demonstrated reluctance to provide medical care, treatment, or meaningful examinations while the study was in effect, and beyond.

It is indisputable that this form of uninformed participation in a human-subject research project is an unreasonable punishment against the vulnerable prisoner class. Without alternative, Gonzalez was made to undergo this experiment as an additional layer of punishment to the already excessive condition that he be subjected to exposure to an incurable lethal hazard. The only difference being that it is the BOP, et alia, who have introduced the exacerbating conditions and then intentionally withheld treatment for the illnesses and physical impairments they have caused. Perhaps these events shall one day result in a Nuremburg-styled trial to fully uncover the truth of what transpired at FCIFC and the BOP. Until that day, Gonzalez puts forth this formal objection to his treatment and punishment for this court's remedial review.

## II.    The dangerous nature of COVID-19 continues to advance creating new dangers and upheaval.

a.    California EPA moratorium lifted

On or about 1/19/21 the State of California lifted its EPA moratorium banning production of high levels of air pollution so that it could accommodate vastly greater

numbers of human cremations. This comes at a time when the number of citizens with COVID-19 in the State exceed 1 million infected. How much more so will the number of infected or prisoner deaths be knowing they are exponentially more likely to become infected and die from the additional punishment of forced exposure to the virus?

This ongoing event, coupled with the BOP's unwillingness or debility to restrain the virus, can only be defined and understood for what it has plainly become; a condition which compounds one's statutory carceral punishment into an excessive sentence impermissible under this nation's laws and Constitution.

b.    The second surge of COVID-19 infections are just the beginning.

While the prison at FCI Forrest City experiences its second (arguably its third) major wave of prisoner and staff COVID-19 infections, several other strains have emerged and are threatening imminent invasion with force greater than that of the original SARS-CoV-2 strain. The U.K. strain, the South African strain, and the South American strain are steadily gaining an invasive foothold on our soil and experts agree that current vaccinations are ineffective to control these resistant variants. Not only do these new strains possess qualities rendering modern medicine ineffective, they have been shown to be much more aggressive in efficacy and potency than previous variants. Prisoners now face not only an inescapable heightened threat from the original SARS-CoV-2 strain, but will now also endure several more formidable variants of the already deadly Coronavirus.

c.    BOP line personnel are collaterally affected.

The MMWR study involving incarcerated or detained persons extends to adversely include prison staff by creating two broad hazardous aspects. First, staff members are themselves susceptible to contracting the COVID-19 infection by virtue of their

exposure to prisoners who have been forced into poorly operated communal living
conditions.  The lack of hygiene supplies, unsanitary conditions, and lack of medical
care serve to accelerate the conveyance of this contagion.  Secondly, staff members
who have even brief, yet repeated, exposures with the prisoners in any of the prison's
study-designed quarantine areas, may serve as mobile vectors of the disease thus
transmitting the COVID-19 virus to outlier prisoners over the course of these brief
encounters.  (MMWR 10/30/20, 69(43): 1569-1570).  To make matters worse, these vectorial
staff members then become likely to infect their families and surrounding communites,
all because their work environment at the prison was made unsafe by the parameters
of the research project while these conditions continue to be observed and studied
by authorities who kept their surveillance goals secret and who may intentionally
restrain efforts to keep participatory prisoners safe and medically protected in
order to further advance their research project objectives.

III.    **The BOP and CDC have failed to protect the prisoners used in their research
        project and have created additional, albeit excessive, punishment factors
        that affect Gonzalez' sentence and which are prohibited by the mandates governing
        human research subjects.**

        a.    45 C.F.R. 46-Protection of Human Research Subjects.

        The National Commission for the protection of human subjects of biomedical
and behavioral research has put forth standardized criteria on this subject, more
commonly known as the Belmont Report.  Much of the criterion used in the Belmont
Report is used and developed in 45 C.F.R. part 46 and has applicability to this
matter now before the court.  The rules and particulars governing the protection
of human research subjects are far too voluminous for recitation here, but Gonzalez
wishes to reference several points which have practical application to this case.

1.      45 CFR part 46 applies to research that "involves a category of subjects
        that [are] vulnerable to coercion or undue inluence, such as...prisoners."(46.107
        et alibi).

2.      An Institutional Review Board (IRB) must approve all research projects using
        human subjects prior to initiation of such research.  (46.103, et al).

3.      The use of prisoners in research does not fall within the scope of exceptions
        under Public Health Surveillance activities.  (46.102(i)(2), et al).

4.      Exemptions to the use of prisoners in research apply only when the research
        is aimed at involving a broader subject population that only incidentally
        includes prisoners.  (46.102(h)(2)).

5.      An informed consent or waiver of documentation of consent must be obtained
        prior to initiation of research involving prisoners.  (46.117, et al).

It appears most, if not all, of the above mandates have been ignored by the

BOP and CDC in their use of Gonzalez, and others, as human research subject in their

study project.  Gonzalez has previously made his court aware of this study project

in his declaration filed on or about April, 2020 (see p.2 of Declaration of Gabriel

Gonzalez, 04-CR-1189(A), last item noted).  Additional documents referencing this

ongoing research project are found in Exhibit 2:

• pg.1 referencing a "BOP project"

• pg.2 showing quarantine mandates

• pg.3 referencing a mysterious "outside source" and "voluntary participation"
        of inmates "to analyze the various aspects of transmission and examine
        testing strategies"

• pgs. 4-7 indicating the reallocation and reassignmetn of prisoners to various
        test dorms.

## Conclusion

The means and manner of the sentence which Gonzalez now serves falls squarely

within the excessive sentence definition.  (see Black's Law Dictionary: "A sentence

that gives more punishment than is allowed by law).  Had Gonzalez known that his

sentence would include eneluctable exposure to a lethal, viral hazard for which there is no cure, he would have received the necessary notice that any conviction he received would have been one inclusive of arbitrary death.  But, when this punishment-phenomenon is evaluated against our current juridical practice and Supreme Court jurisprudence, we find this circumstance in conflict with precedents avowing, adopting, and conforming carceral conditions with the evolving standards of decency that mark the progress of a maturing society.  (Trop v. Dulles 356 U.S. 86, 101).  History certainly cannot offer a legislative parallel to the kind of punishment extant under COVID-19 exposure within the BOP and we can be certain that exposure to biological hazards will never become part of our legitimate penological scheme.

Gonzalez has also shown the BOP and DOJ intentionally increased his sentence in a manner which exceeds that punishment promulgated by our legislature and that which was imposed by the sentencing court.  Some of these factors include:

1.      Lack of protection; both from exposure to the virus and by the BOP's unwillingness to issue full PPE gear, hygiene supplies, and enough nutrition and exercise to maintain a healthy condition;

2.      Lack of medical care; The unwillingness or inability to provide pharmaceuticals, examinations, or treatments for less than severe cases and the rote denial of care by directing prisoners to self-treat using the prison commissary OTC medications;

3.      Intentional apathy; is demonstrated by the numerous deprecatory email responses chastising Gonzalez for asking for help and directing him to seek medical care from the prison's Trust Fund staff;

4.      Forced study participation; The deliberate segregation into wholly viral communities coupled with SHU-like conditions and no medical care likely exacerbate already dangerous circumstances,

5.      Punitive conditions; The placement in the prison's woodshop, recreation warehouse, or other non-domiciliary outlier buildings often result from complaining about COVID-19 symptoms.

These five factors, while actionable individually and separately, certainly compound and aggravate the already pernicious transformative ex post facto sentence Gonzalez now serves.  This Circuit has a history of standing firm against such abuses

against prisoners, expecially when obdurance and wantonness form the basis of the
abuse. (see Hutto v. Finney 429 U.S. 103, also DeShaney v. Winnebago City Department
of Social Services 489 U.S. 189, 198-200 (1989)).

The addition of these punishments and other punitory excesses are neither
short term nor one time. Instead, they serve to form and establish a continuing
and systemic proviso for unlegislated punishment(s) under the guise of lack of funding,
lack of resources, lack of technical assistance, or any other of the myriad deflections
and disinformation touted by the custodians of those oppressed prisoners. Prison
personnel and prisoners alike share the dangers inherent in this exposure-infection-
and reinfection prison climate and matters will certainly escalate as the U.K.,
S. African, and S. American strains invade our prison(s).

Undoubtably, COVID-19 and its progeny are beyond containment or prevention
by the BOP, but further harm is avoidable with this court's intervention. Given
the opportunity, even if it were temporarily to shelter at home or some similar
alternative, Gonzalez could avoid what is sure to be the demise of his physiological
system(s) or which will serve to be an early termination of his life.

In an era where our laws comport with the wisdom of Estelle v. Gamble (429 U.S.
97), Helling v. McKinney (509 U.S. 25), Wilson v. Seiter (501 U.S. 294), and Farmer
v. Brennan (511 U.S. 825), our jurisprudence consistently opposes regimes rife with
persistent and malicious cruelty and obdurate and wonton malice against prisoners.
Our Constitution even incorporates a stand-alone Amendment to serve as a bulwark
to the very excessive punishments and conditions as listed above which serve no
legitimate penological interests. Perhaps that is why the ACLU Leadership Conference
on Civil and Human Rights has recently petitioned congressional leaders to effect
changes aimed at providing prisoners with greater COVID-19 protections through
alternative incarceration options. (Exhibit 3).

Gonzalez prays this honorable court finds the excesses and atrocities described
herein to be violative fo the Constitution and laws of the United States, finds

that Gonzalez now suffers an excessive and unconstitutional sentence based on the above, and grants him relief from his sentence and any other relief this court finds to be proper and just.

## Verification

I have read the foregoing Brief in support of § 2241 motion and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct. Executed at Forrest City, Arkansas on this 23rd day of January, 2020.

Gabriel Gonzalez
Plaintiff, Pro Se

## Certificate of Service

I certify under the penalty of perjury that the foregoing Brief in support of § 2241 Motion was placed in the prison's internal mail system, postage pre-paid, for service upon this court via U.S. mail on this 23rd day of January, 2020 to 600 W. Capitol Avenue Rm. A-149 Little Rock, Arkansas 72201. Gonzalez asks this court's clerk to serve all other interested parties via electronic notification and to serve him with a stamped filed copy of this motion.

Gabriel Gonzalez
Plaintiff, Pro Se

Morbidity and Mortality Weekly Report

# Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020

Liesl M. Hagan, MPH[1]; Samantha P. Williams, PhD[1]; Anne C. Spaulding, MD[2,3]; Robin L. Toblin, PhD[4]; Jessica Figlenski, MPH[4];
Jeanne Ocampo[4]; Tara Ross[4]; Heidi Bauer, MD[5]; Justine Hutchinson, PhD[5]; Kimberley D. Lucas, MPH[5]; Matthew Zahn, MD[6];
Chun Chiang, MD[6]; Timothy Collins, MPH[6]; Alexis Burakoff, MD[7]; Juli Bettridge[7]; Ginger Stringer, PhD[7]; Randolph Maul, MD[8]; Kristen Waters[8];
Courtney Dewart, PhD[9,10]; Jennifer Clayton[11]; Sietske de Fijter, MS[9]; Radha Sadacharan, MD[12,13]; Linda Garcia, MPH[14]; Naomi Lockett, MD[13];
Kirstin Short, MPH[14]; Laxman Sunder, MD[13]; Senad Handanagic, MD[1]

Preventing coronavirus disease 2019 (COVID-19) in correctional and detention facilities* can be challenging because of population-dense housing, varied access to hygiene facilities and supplies, and limited space for isolation and quarantine (1). Incarcerated and detained populations have a high prevalence of chronic diseases, increasing their risk for severe COVID-19–associated illness and making early detection critical (2,3). Correctional and detention facilities are not closed systems; SARS-CoV-2, the virus that causes COVID-19, can be transmitted to and from the surrounding community through staff member and visitor movements as well as entry, transfer, and release of incarcerated and detained persons (1). To better understand SARS-CoV-2 prevalence in these settings, CDC requested data from 15 jurisdictions describing results of mass testing events among incarcerated and detained persons and cases identified through earlier symptom-based testing. Six jurisdictions reported SARS-CoV-2 prevalence of 0%–86.8% (median = 29.3%) from mass testing events in 16 adult facilities. Before mass testing, 15 of the 16 facilities had identified at least one COVID-19 case among incarcerated or detained persons using symptom-based testing, and mass testing increased the total number of known cases from 642 to 8,239. Case surveillance from symptom-based testing has likely underestimated SARS-CoV-2 prevalence in correctional and detention facilities. Broad-based testing can provide a more accurate assessment of prevalence and generate data to help control transmission (4).

In May 2020, CDC requested data from 15 jurisdictions (the Federal Bureau of Prisons [BOP], 10 state prison systems, and four city or county jails), describing SARS-CoV-2 mass testing events† and cases identified before mass testing. Jurisdictions were selected based on previous discussions with investigators about mass testing events that had already occurred. Six jurisdictions provided data from 16 adult facilities, including the number of COVID-19 cases identified among incarcerated or detained persons and staff members before mass testing and findings from subsequent mass testing events§ among incarcerated or detained persons. Data describing mass testing of staff members were not available. One jurisdiction also provided results of retesting among quarantined close contacts of persons with COVID-19, 7 days after their initial negative test result from mass testing. All jurisdictions provided qualitative information describing testing practices before mass testing, actions taken based on mass testing results, and barriers to future broad-based testing. SARS-CoV-2 prevalence was calculated within each facility and by housing type. The numbers of known cases before and after mass testing were compared. Qualitative data were summarized. All analyses were descriptive; significance testing was not performed. This investigation was reviewed by CDC for human subjects protection and determined to be nonresearch.¶

Six of the 15 queried jurisdictions (BOP, three state prison systems, and two county jails) provided aggregate, facility-level data representing 16 adult facilities (11 state prisons, three federal prisons, and two county jails). From the beginning of the COVID-19 pandemic until the date of their respective mass testing events, four facilities limited testing among incarcerated or detained persons to those with symptoms, and 12 also tested close contacts; six facilities tested small numbers of symptomatic staff members, and 10 advised staff members to seek testing from their own health care providers or health department.

All 16 facilities had identified at least one case through symptom-based testing before mass testing was conducted; the first case was identified among staff members in nine facilities, among incarcerated or detained persons in six, and in both groups the same day in one. One facility identified

---

* Correctional facilities refer to state and federal prisons that incarcerate persons who have been tried for and convicted of a crime, convicted, and sentenced for a duration of ≥1 year. Those convicted of federal crimes are incarcerated in federal prisons; those convicted of state crimes are incarcerated in state prisons. Detention facilities refer to jails or detention centers (including immigration detention centers) that temporarily detain persons awaiting trial, sentencing, or deportation, or those with a sentence of <1 year.
† Mass testing consisted of offering reverse transcription–polymerase chain reaction (RT-PCR) testing to all persons incarcerated or detained in at least one housing unit of a correctional or detention facility at a single point in time, irrespective of presence or history of symptoms.

§ Data elements collected included mass testing dates, facility census during testing, number of persons tested, number who declined, housing arrangements of persons tested, and test results.
¶ U.S. Department of Health and Human Services, Title 45 Code of Federal Regulations 46, Protection of Human Subjects.

EXHIBIT 1
1 OF 12

a case only among incarcerated or detained persons (no staff member cases), and one facility identified a case only among staff members. The number of cases identified using symptom-based testing ranged from 0 to 181 (median = 19) among incarcerated or detained persons and 0 to 257 (median = 10) among staff members.

Mass testing in the 16 facilities was conducted during April 11–May 20. The interval between identification of the first symptomatic case and the start of mass testing ranged from 2 to 41 days (median = 25 days). Across facilities, 16,392 incarcerated or detained persons were offered testing, representing 2.3%–99.6% (median = 54.9%) of facilities' total populations; 7,597 previously unrecognized infections were identified (Table). All 15 facilities that had identified at least one case among incarcerated or detained persons through earlier symptom-based testing identified additional cases through mass testing (range = 8–2,179; median = 374). Mass testing increased total known cases from 642 (range = 2–181, median = 19) before mass testing to 8,239 (range = 10–2,193, median = 403) after mass testing (Figure), representing a 1.5–157-fold increase (median 12.3-fold) in each facility. The single facility that had identified no cases among incarcerated or detained persons before mass testing also found no cases during mass testing; with this facility included, the median fold-increase in total known cases after mass testing decreased slightly to 12.1-fold. In the 16 facilities, SARS-CoV-2 prevalence found during mass testing among incarcerated or detained persons ranged from 0% to 86.8% (median = 29.3%). Testing refusal rates ranged from 0.0% to 17.3% (median = 0.0%) (Table).

In addition to aggregate facility-level data, four of six jurisdictions provided mass testing data from 85 housing units within 12 of the 16 facilities. Forty-eight housing units were dormitory-based (open, communal spaces housing 63 to 216 persons in one room), and 37 were cell-based (with locked cells housing one to eight persons each). SARS-CoV-2 prevalence ranged from 1.8% to 45.0% (median = 14.6%) in cell-based units and 0% to 77.2% (median = 42.6%) in dormitory-based units.

In two federal prisons, all persons who had tested negative during mass testing events and had subsequently been quarantined as close contacts of persons testing positive were retested after 7 days. At retesting, 90 of 438 (20.5%) persons in BOP prison 2 and 84 of 314 (26.8%) in BOP prison 3 had positive test results.

Jurisdictions reported that mass testing results helped them construct medical isolation cohorts for persons testing positive and quarantine cohorts for their close contacts to prevent continued transmission. In some jurisdictions, results informed targeted testing strategies among asymptomatic persons in facilities where mass testing had not yet occurred (e.g., routine testing at intake, release, and before community-based appointments, and periodic testing of those assigned to work details requiring movement between different facility areas, such as food or laundry service). Jurisdictions reported that mass testing required large investments of staff member time and operational resources, and that the ability to rearrange housing based on test results was sometimes limited by space constraints. Jurisdictions stated that evidence-based recommendations about a potential role for less time- and resource-intensive testing (e.g., point-of-care antigen or antibody testing) and swabbing methods could help them expand testing in the future.

## Discussion

High SARS-CoV-2 prevalence detected during mass testing events in a convenience sample of correctional and detention facilities suggests that symptom-based testing underestimates the number of COVID-19 cases in these settings. Mass testing resulted in a median 12.1-fold increase in the number of known infections among incarcerated or detained persons in these facilities, which had previously used symptom-based testing strategies only.

Symptom-based testing cannot identify asymptomatic and presymptomatic persons,[**] who represent an estimated 40%–45% of infected persons across settings (5). Symptom-based testing might also be limited by hesitancy to report symptoms within correctional and detention environments because of fear of medical isolation and stigma (6). In the facilities included in this analysis, mass testing allowed administrators to medically isolate infected persons irrespective of symptoms and to quarantine their close contacts to reduce ongoing transmission. Testing refusal rates in these facilities of up to 17.3% highlight the need to communicate the importance of testing and address fear and stigma, with care to tailor messages to cultural and linguistic needs, and to develop strategies to reduce transmission risk from persons who decline testing.

High SARS-CoV-2 prevalence among persons quarantined and retested 7 days after an initial negative result indicates that curbing transmission in correctional and detention environments might require multiple testing rounds, coupled with other recommended prevention and control measures (7). Test-based release from quarantine could also be warranted. Serial testing among quarantined contacts of infected persons in a Louisiana correctional and detention facility found a 36% positivity rate 3 days after an initial negative result, indicating that a short retest interval could improve case identification (8).

---

[**] Presymptomatic persons are those who are infected with SARS-CoV-2 and do not have symptoms at the time of testing, but who develop symptoms later. Asymptomatic persons are those who are infected with SARS-CoV-2 but never develop symptoms. Both presymptomatic and asymptomatic persons can transmit the virus to others.

EXHIBIT 1
2 OF 12

Morbidity and Mortality Weekly Report

**TABLE. Results of SARS-CoV-2 mass testing events\* among incarcerated or detained persons in 16 prisons and jails — six jurisdictions, United States, April–May 2020**

| Jurisdiction/Facility | No. of days between identification of first case and start of mass testing[†] | Total persons incarcerated or detained in the facility during mass testing[§] | No. (%) offered testing[¶] | No. (%) who declined testing | No. (%) tested | No. with interpretable results | No. (%) testing positive | Type of housing in tested units (open dorm, cells, or both)\*\* |
|---|---|---|---|---|---|---|---|---|
| **Federal Bureau of Prisons[††]** | | | | | | | | |
| Prison 1 | 25 | 1,534 | 957 (62.4) | 166 (17.3) | 791 (82.7) | 786 | 566 (72.0) | Open dorm |
| Prison 2 | 39 | 1,247 | 1,236 (99.1) | 0 (0.0) | 1,236 (100) | 1,157 | 893 (77.2) | Open dorm |
| Prison 3 | 21 | 1,070 | 997 (93.2) | 0 (0.0) | 997 (100) | 992 | 551 (55.5) | Both |
| **California** | | | | | | | | |
| Prison 1 | 27 | 3,175 | 257 (8.1) | 39 (15.2) | 218 (84.8) | 217 | 34 (15.7) | Cells |
| Prison 2 | 18 | 3,739 | 441 (12.0) | 6 (1.4) | 435 (98.6) | 433 | 8 (1.8) | Cells |
| Prison 3 | 2 | 2,325 | 54 (2.3) | 0 (0.0) | 54 (100) | 54 | 23 (42.6) | Open dorm |
| Prison 4 | 41 | 3,419 | 2,153 (63.0) | 15 (0.7) | 2,138 (99.3) | 2,128 | 371 (17.4) | Both |
| Prison 5 | 34 | 1,565 | 740 (47.3) | 4 (0.5) | 736 (99.5) | 736 | 99 (13.5) | Cells |
| Prison 6 | NA | 3,327 | 92 (2.8) | 0 (0.0) | 92 (100) | 92 | 0 (0.0) | Open dorm |
| **Colorado** | | | | | | | | |
| Prison 1 | 28 | 2,340 | 2,296 (98.1) | 1 (<0.01) | 2,295 (99.9) | 2,262 | 375 (16.6) | Cells |
| Prison 2 | 5 | 1,704 | 299 (17.5) | 0 (0.0) | 299 (100) | 297 | 35 (11.8) | Cells |
| **Ohio** | | | | | | | | |
| Prison 1 | 7 | 497 | 442 (88.9) | 0 (0.0) | 442 (100) | 442 | 94 (21.3) | Both |
| Prison 2 | 12 | 2,521 | 2,510 (99.6) | 0 (0.0) | 2,510 (100) | 2,510 | 2,179 (86.8) | Both |
| Prison 3 | 7 | 2,024 | Unknown | Unknown | 1,846 | 1,846 | 1,476 (80.0) | Both |
| **Orange County, California** | | | | | | | | |
| Jail 1 | 34 | 3,167 | 1,002 (31.6) | 0 (0.0) | 1,002 (100) | 1,002 | 374 (37.3) | Both |
| **Texas** | | | | | | | | |
| Jail 1 | 27 | 7,800 | 1,070 (13.7) | 0 (0.0) | 1,070 (100) | 1,070 | 519 (48.5) | Both |
| **Total** | — | 41,454 | 16,392 (39.5) | 231 (1.6) | 16,161 (98.6) | 16,024 | 7,597 (47.4) | — |

\* Mass testing was defined as offering SARS-CoV-2 testing by reverse transcription–polymerase chain reaction (RT-PCR) to all incarcerated or detained persons in at least one housing unit of a jail or prison, irrespective of presence or history of symptoms.
[†] The first COVID-19 case in each facility was identified using a symptom-based approach.
[§] The highest number of incarcerated or detained persons in the facility on a single day during the mass testing event.
[¶] Some facilities offered SARS-CoV-2 testing to incarcerated or detained persons in all housing units. Others offered testing in selected housing units based on criteria including whether units had already identified cases, housed a large number of persons with underlying health conditions, or housed persons who were assigned to work details that required movements across the facility (e.g., food or laundry service).
\*\* Open dorm units in these facilities housed from 63 to 216 persons in one space where they could interact freely. Cell-based units were comprised of locked cells housing from one to eight persons each.
[††] The Federal Bureau of Prisons (BOP) has jurisdiction over federal prisons across the United States. The three BOP facilities with data presented here are located in three different states.

This analysis can inform testing practices in correctional and detention facilities in at least three areas. First, testing staff members at regular intervals, regardless of symptoms, could become an important part of facilities' COVID-19 prevention and mitigation plans, in collaboration with relevant stakeholders, including labor unions. In this study, more than half of the facilities identified their first case among staff members, consistent with previous CDC findings that staff members can introduce the virus into correctional and detention environments (9). Second, in descriptive analyses, the median prevalence of SARS-CoV-2 was nearly three times higher in dormitory-based housing units (42.6%) than in cell-based units (14.6%), suggesting that housing configuration might contribute to transmission. Further study is warranted to determine whether more frequent testing could reduce transmission in dormitory-based housing. Third, these mass testing events

occurred 2–41 days after identification of the facilities' first cases. Additional studies should examine whether timing of mass testing influences its effectiveness in facilitating outbreak containment. In a study involving five health department jurisdictions that conducted facility-wide testing in 88 nursing homes that had already identified at least one case, an estimated 1.3 additional cases were identified for each additional day between identification of the first case and completion of facility-wide testing, indicating that facility-wide testing early in an outbreak can be an effective mitigation strategy (10).

The findings in this report are subject to at least six limitations. First, these facilities represent a convenience sample and are not representative of all U.S. correctional and detention facilities. Second, because facilities' decisions to conduct mass testing might be based on differing population characteristics, epidemiologic factors, and policy considerations, statistical

Morbidity and Mortality Weekly Report

**FIGURE. COVID-19 cases identified among incarcerated or detained persons during mass testing events (April–May) and through symptom-based testing (January–April) in 16 prisons and jails — six U.S. jurisdictions, 2020**



**Abbreviations:** BOP = Federal Bureau of Prisons; COVID-19 = coronavirus disease 2019.

significance testing was not performed. Third, the number of cases identified through mass testing might be higher in facilities where mass testing occurred closer to the peak of an outbreak (a factor that could not be determined with available data), or in facilities that tested a higher proportion of their population. Fourth, data regarding symptoms reported during mass testing were unavailable, preventing calculation of the percentage of persons with positive test results who were symptomatic. Fifth, cases among staff members identified before mass testing are likely underestimated because most facilities relied largely on self-reporting. Finally, it is uncertain whether the housing unit where a person with COVID-19 was tested was the location where exposure occurred.

Challenges in practicing physical distancing and other prevention strategies within correctional and detention facilities place persons in these settings, many of whom have chronic diseases, at high risk for SARS-CoV-2 exposure. This analysis demonstrates that mass testing irrespective of symptoms, combined with periodic retesting, can identify infections and support prevention of widespread transmission in correctional and detention environments. Further research is warranted to refine strategic testing approaches that individual facilities can implement, based on local needs and resources, to contribute to COVID-19 mitigation.

### Acknowledgments

State and local departments of health and departments of corrections; Federal Bureau of Prisons; affected facilities contributing data; Jeffery Allen, Thomas Dixon, Cora Hoover, Julie King, Heather Scobie.

Corresponding author: Liesl Hagan, vqf8@cdc.gov.

EXHIBIT 1
4 of 12

Morbidity and Mortality Weekly Report

## Summary

**What is already known about this topic?**

SARS-CoV-2 outbreaks in correctional and detention facilities are difficult to contain because of population-dense housing and limited space for medical isolation and quarantine. Testing in these settings has often been limited to symptomatic persons.

**What is added by this report?**

Mass testing in 16 U.S. prisons and jails found SARS-CoV-2 prevalence ranging from 0%–86.8%, a median 12.1-fold increase over the number of cases identified by earlier symptom-based testing alone. Median prevalence was three times higher in dormitory-based than in cell-based housing.

**What are the implications for public health practice?**

In correctional and detention facilities, broad-based SARS-CoV-2 testing provides a more accurate assessment of disease prevalence than does symptom-based testing and generates data that can potentially help control transmission.

[1]CDC; [2]Emory University Rollins School of Public Health, Atlanta, Georgia; [3]Morehouse School of Medicine, Atlanta, Georgia; [4]Federal Bureau of Prisons, Washington, DC; [5]California Correctional Health Care Services; [6]Orange County Health Care Agency, Santa Ana, California; [7]Colorado Department of Public Health and Environment; [8]Colorado Department of Corrections; [9]Ohio Department of Health; [10]Epidemic Intelligence Service, CDC; [11]Ohio Department of Rehabilitation and Correction; [12]Brown University Department of Family Medicine, Providence, Rhode Island; [13]Harris County Sheriff's Office, Houston, Texas; [14]Houston Health Department, Houston, Texas.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. Anne C. Spaulding reports funding from the following entities to consult on COVID-19 control in correctional facilities: Harris County, Texas (funds to be paid to Emory University), the National Sheriff's Association (funds to be paid to Emory University), and Guardian (travel funds only). Dr. Spaulding also reports grants from Gilead Sciences, the National Commission on Correctional Health Care, bioLytical Sciences, and Cellex outside the submitted work. No other potential conflicts of interest were disclosed by authors.

## References

1. Wallace M, Marlow M, Simonson S, et al. Public health response to COVID-19 cases in correctional and detention facilities—Louisiana, March–April 2020. MMWR Morb Mortal Wkly Rep 2020;69:594–8. https://doi.org/10.15585/mmwr.mm6919e3
2. Hawks L, Woolhandler S, McCormick D. COVID-19 in prisons and jails in the United States. JAMA Intern Med 2020;180:1041. https://doi.org/10.1001/jamainternmed.2020.1856
3. Maruschak LM, Berzofsky M, Unangst J. Medical problems of state and federal prisoners and jail inmates, 2011–12. Washington, DC: Department of Justice, Bureau of Justice Statistics; 2015. https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
4. CDC. Interim considerations for SARS-CoV-2 testing in correctional and detention facilities. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html
5. Oran DP, Topol EJ. Prevalence of asymptomatic SARS-CoV-2 infection: a narrative review. Ann Intern Med 2020;M20-3012. https://doi.org/10.7326/M20-3012
6. Wurcel AG, Dauria E, Zaller N, et al. Spotlight on jails: COVID-19 mitigation policies needed now. Clin Infect Dis 2020;71:891–2. https://doi.org/10.1093/cid/ciaa346
7. CDC. Interim guidance on management of coronavirus disease 2019 (COVID-19) in correctional and detention facilities. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
8. Njuguna H, Wallace M, Simonson S, et al. Serial laboratory testing for SARS-CoV-2 infection among incarcerated and detained persons in a correctional and detention facility—Louisiana, April–May 2020. MMWR Morb Mortal Wkly Rep 2020;69:836–40. https://doi.org/10.15585/mmwr.mm6926e2
9. Wallace M, Hagan L, Curran KG, et al. COVID-19 in correctional and detention facilities—United States, February–April 2020. MMWR Morb Mortal Wkly Rep 2020;69:587–90. https://doi.org/10.15585/mmwr.mm6919e1
10. Hatfield KM, Reddy SC, Forsberg K, et al. Facility-wide testing for SARS-CoV-2 in nursing homes—seven U.S. jurisdictions, March–June 2020. MMWR Morb Mortal Wkly Rep 2020;69:1095–9. https://doi.org/10.15585/mmwr.mm6932e5

EXHIBIT 1
5 OF 12

# Notes from the Field

## COVID-19 Prevention Practices in State Prisons — Puerto Rico, 2020

Elizabeth Davlantes, MD[1]; Mayra Toro, MS[2]; Raúl Villalobos, MD[3]; Liliana Sanchez-Gonzalez, MD[1]

As of August 17, 2020, the Puerto Rico Department of Health had reported 11,723 confirmed cases of coronavirus disease 2019 (COVID-19), 15,037 probable cases, and 335 deaths. Among persons incarcerated in state prisons, a high-risk congregate setting, only two COVID-19 cases and no associated deaths had been reported* (1). These results followed implementation in mid-March of a protocol (2) for the diagnosis, management, and prevention of COVID-19 in all Puerto Rico Department of Correction and Rehabilitation prisons based on CDC's interim guidance on management of COVID-19 in correctional and detention facilities (3). The protocol featured wide-ranging measures, from visitor restrictions to enhanced cleaning; this report focuses specifically on COVID-19 mitigation measures directed toward incarcerated persons.

To minimize SARS-CoV-2 transmission from newly incarcerated persons, all state prison intakes in Puerto Rico now occur at a single location, in the municipality of Bayamon. All new intake procedures include SARS-CoV-2 reverse transcription–polymerase chain reaction (RT-PCR) testing regardless of symptoms. Asymptomatic persons awaiting test results are cohorted in groups of no more than 20 in the intake area. If everyone in the group tests negative for SARS-CoV-2, and all remain asymptomatic during 14 days of quarantine, they are released into the general prison population. Those who test positive and those with any medical concerns are immediately isolated and referred to the onsite medical facility. If any cohort member tests positive for SARS-CoV-2, either from the intake assessment or after becoming symptomatic in quarantine, the entire cohort must restart the intake process.

Incarcerated persons who leave the prison grounds for any reason (e.g., medical appointments or court appearances) must restart the intake process upon their return. During March 16–July 31, 2020, 1,340 persons entered Puerto Rico Department of Correction and Rehabilitation prisons, and two (0.1%) had positive SARS-CoV-2 RT-PCR test results. Both patients were asymptomatic, and no persons in their cohorts developed COVID-19.

The general prison population is separated into groups of 40–75 persons; these groups do not share common areas with other persons in the facility. If any group member exhibits COVID-19 symptoms, which are defined according to CDC guidelines (4), the symptomatic person is isolated in the prison's medical facility, and the entire group is quarantined until the symptomatic person receives a negative SARS-CoV-2 RT-PCR result. There have been no suspected COVID-19 cases among the general prison population.

In May 2020, SARS-CoV-2 serologic testing was offered to all incarcerated adults using a point-of-care antibody test. This was done to evaluate the prevalence of SARS-CoV-2 antibody positivity in the prison population, particularly given the low percentage of positive SARS-CoV-2 RT-PCR test results among new arrivals. Among 8,619 adults tested, 31 (0.3%) had immunoglobulin G antibodies, suggesting past infection, and none had immunoglobulin M antibodies, indicating active or recent infection.

Efforts to mitigate SARS-CoV-2 transmission, including rigorous intake screening and cohorting, likely have helped prevent an outbreak in the state prison population. Puerto Rico's measures to protect incarcerated persons from COVID-19 can serve as a case study in the successful implementation of CDC's guidelines for correctional facilities, particularly the prevention practices for incarcerated or detained persons (3).

Corresponding author: Mayra Toro, mtoro@salud.pr.gov.

[1]CDC; [2]Puerto Rico Department of Health; [3]Physician Correctional, San Juan, Puerto Rico.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

### References

1. Wallace M, Hagan L, Curran KG, et al. COVID-19 in correctional and detention facilities—United States, February–April 2020. MMWR Morb Mortal Wkly Rep 2020;69:587–90. https://doi.org/10.15585/mmwr.mm6919e1
2. Physician Correctional. Prevention and management of infections for coronavirus COVID-19 [Spanish]. San Juan, Puerto Rico: Physician Correctional; 2020. http://dcr.pr.gov/wp-content/uploads/2020/04/Prevencion-y-Manejo-de-Infecciones-por-Coronavirus.pdf
3. CDC. Interim guidance on management of coronavirus disease 2019 (COVID-19) in correctional and detention facilities. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
4. CDC. Symptoms of coronavirus. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

* Four additional COVID-19 cases were identified in persons awaiting trial.

EXHIBIT 1
6 OF 12

Morbidity and Mortality Weekly Report

# Racial and Ethnic Disparities Among COVID-19 Cases in Workplace Outbreaks by Industry Sector — Utah, March 6–June 5, 2020

David P. Bui, PhD[1,2]; Keegan McCaffrey[3]; Michael Friedrichs, MS[3]; Nathan LaCross, PhD[3]; Nathaniel M. Lewis[1,3]; Kylie Sage, MS[3]; Bree Barbeau, MPH[3]; Dede Vilven, MPH[4]; Carolyn Rose, MPH[5]; Sara Braby[6]; Sarah Willardson, MPH[7]; Amy Carter[8]; Christopher Smoot, MPH[9]; Andrea Winquist, MD, PhD[2]; Angela Dunn, MD[3]

*On August 17, 2020, this report was posted as an* MMWR *Early Release on the* MMWR *website (https://www.cdc.gov/mmwr).*

Improved understanding of the overall distribution of workplace coronavirus disease 2019 (COVID-19) outbreaks by industry sector could help direct targeted public health action; however, this has not been described. The Utah Department of Health (UDOH) analyzed COVID-19 surveillance data to describe workplace outbreaks by industry sectors. In this report, workplaces refer to non–health care, noncongregate–living, and noneducational settings. As of June 5, 2020, UDOH reported 277 COVID-19 outbreaks, 210 (76%) of which occurred in workplaces. Approximately 12% (1,389 of 11,448) of confirmed COVID-19 cases in Utah were associated with workplace outbreaks. The 210 workplace outbreaks occurred in 15 of 20 industry sectors;* nearly one half of all workplace outbreaks occurred in three sectors: Manufacturing (43; 20%), Construction (32; 15%) and Wholesale Trade (29; 14%); 58% (806 of 1,389) of workplace outbreak-associated cases occurred in these three sectors. Although 24% of Utah's workforce in all 15 affected sectors identified as Hispanic or Latino (Hispanic) or a race other than non-Hispanic white (nonwhite†) (*1*), 73% (970 of 1,335) of workplace outbreak-associated COVID-19 cases were in persons who identified as Hispanic or nonwhite. Systemic social inequities have resulted in the overrepresentation of Hispanic and nonwhite workers in frontline occupations where exposure to SARS-CoV-2, the virus that causes COVID-19, might be higher (*2*); extra vigilance in these sectors is needed to ensure prevention and mitigation strategies are applied equitably and effectively to workers of racial and ethnic groups disproportionately affected by COVID-19. Health departments can adapt workplace guidance to each industry sector affected by COVID-19 to account for different production processes and working conditions.

Data on workplace COVID-19 outbreaks occurring during March 6–June 5, 2020, were collected from UDOH's COVID-19 case surveillance system. UDOH defined workplace outbreaks as the occurrence of two or more laboratory-confirmed COVID-19 cases occurring within the same 14-day period among coworkers in a common workplace (i.e., same facility). UDOH classifies outbreaks in congregate living facilities, educational institutions, and health care facilities as distinct outbreak types that are managed differently from general workplace outbreaks because of the special populations they serve and the setting-specific guidance they require. Thus, cases from these settings were not included in this analysis of workplace outbreaks. Case investigators collected facility addresses, business names, or both for all workplace outbreaks. Workplaces were classified according to the North American Industry Classification System (NAICS; https://www.census.gov/eos/www/naics/) into one of 20 industry sectors. NAICS codes for workplaces were obtained from Utah's Division of Corporations and Commercial Code directory of registered businesses (https://secure.utah.gov/bes/). Because of small case numbers and similarities in sector processes and settings, the sectors for Professional, Scientific, and Technical services and Information were combined into a single category, as were the Finance and Insurance, Real Estate and Rental and Leasing, and Public Administration sectors.

The distribution of workplace outbreaks and associated cases across sectors was described. Outbreak incidence (cases per 100,000 workers) was calculated using Utah sector workforce estimates reported in the 2019 Census Quarterly Workforce Indicators (*1*) for sector denominators; workforce estimates were not adjusted to remove workers affected by outbreaks in excluded settings (e.g., educational workers and health care workers). Descriptive statistics and chi-squared tests were used to summarize and compare demographics and outcomes (e.g., hospitalization) of persons with workplace outbreak-associated COVID-19 with persons of working age (≥15 years) with nonoutbreak–associated COVID-19 (i.e., cases not associated with an outbreak). To identify sectors in which COVID-19

---

* The 20 industry sectors include Agriculture, Forestry, Fishing and Hunting; Mining, Quarrying, and Oil and Gas Extraction; Utilities; Construction; Manufacturing; Wholesale Trade; Retail Trade; Transportation and Warehousing; Information; Finance and Insurance; Real Estate and Rental and Leasing; Professional, Scientific, and Technical Services; Management of Companies and Enterprises; Administrative and Support and Waste Management and Remediation Services; Educational Services; Health Care and Social Assistance; Arts, Entertainment, and Recreation; Accommodation and Food Services; Other Services (except Public Administration); and Public Administration (https://www.census.gov/eos/www/naics/). No workplace outbreaks were reported in the following sectors: Agriculture, Forestry, Fishing and Hunting; Mining, Quarrying, and Oil and Gas Extraction; Utilities; Management of Companies and Enterprises; and Educational Services.

† Nonwhite includes the following (all non-Hispanic): black or African American, American Indian or Alaska Native, Asian, Native Hawaiian or Other Pacific Islander, two or more races, or other race groups.

EXHIBIT 1
7 OF 12

racial and ethnic disparities might be unrecognized, the racial and ethnic composition of workplace outbreak-associated cases were compared with the overall racial and ethnic composition in each sector in Utah. All statistical analyses were done in R (version 3.6.1; The R Foundation); p-values <0.05 were considered statistically significant.

During March 6–June 5, 2020, UDOH reported 11,448 confirmed COVID-19 cases throughout Utah, including 1,389 (12%) associated with workplace outbreaks, 1,081 (9%) associated with outbreaks in other settings (i.e., congregate living, educational, health care), and 8,978 (78%) that were not associated with an outbreak. UDOH reported 210 workplace COVID-19 outbreaks (median cases per workplace outbreak = 4; range = 2–79) involving 15 industry sectors, most frequently in Manufacturing (43; 20%), Construction (32; 15%), and Wholesale Trade (29; 14%); these three sectors accounted for 58% (806 of 1,389) of workplace outbreak-associated cases (Table 1). The incidence among workplace outbreak-associated cases was highest in the Wholesale Trade (377 per 100,000 workers) and Manufacturing (339 per 100,000 workers) sectors.

Compared with persons aged ≥15 years with nonoutbreak–associated COVID-19 (median age = 38 years), persons with workplace outbreak-associated COVID-19 were older (median age = 41 years) (Mann-Whitney test, p = 0.01), more likely to identify as Hispanic (56.4% versus 39.8%; p <0.001), and more likely to be male (61.4% versus 50.6%; p <0.001) (Table 2). The proportion of patients hospitalized was significantly lower among persons with workplace outbreak-associated COVID-19 (6.1%) than among those with nonoutbreak–associated COVID-19 (7.6%) (p = 0.01).

Among persons with workplace outbreak-associated COVID-19, information on race and ethnicity was available for 1,335 (96%); 783 (59%) workers with workplace outbreak-associated COVID-19 identified as Hispanic, 365 (27%) as non-Hispanic white, and 187 (19%) as nonwhite. In total, 970 (73%) of persons with workplace outbreak-associated COVID-19 identified as Hispanic or nonwhite, although these ethnic/racial groups represent <24% of Utah's workforce in the 15 affected industry sectors (1). This disparity was observed across all 15 industry sectors with the largest in Wholesale Trade (percentage point difference between percentage of Hispanic or nonwhite workers among workplace outbreak-associated COVID-19 cases and the overall workforce = 58) and Manufacturing (percentage point difference = 53) sectors (Figure).

## Discussion

During March 6–June 5, COVID-19 outbreaks were identified in nearly all assessed industry sectors in Utah, with approximately one half of workplace outbreak-associated cases occurring in three sectors: Manufacturing, Construction, and Wholesale Trade. Persons with workplace outbreak-associated COVID-19 were disproportionately Hispanic or nonwhite compared with overall racial/ethnic distributions in these industry sectors. Sector-specific COVID-19 guidance, which CDC has generated for many industries,[§,¶,**] should be followed to account for different production processes, business operations, and working conditions faced by workers in these sectors. When available, efforts should be made to help employers operationalize sector-specific guidance; CDC and UDOH plain-language business guides can help employers manage and prevent workplace outbreaks and exposures.[††] Avoiding introduction of SARS-CoV-2 into workplaces is critical to preventing outbreaks, making both community- and workplace-specific interventions important if SARS-CoV-2 transmission in workplace settings is to be prevented. Health departments and employers need to ensure mitigation strategies are provided using culturally and linguistically responsive materials and messages, which reach workers of racial and ethnic minority groups, especially those disproportionately affected by workplace COVID-19 outbreaks.

The racial and ethnic disparities in workplace outbreak-associated COVID-19 cases found in Utah and identified in meat processing facility outbreaks in other states (3) demonstrate a disproportionate risk for COVID-19. These disparities might be driven, in part, by longstanding health and social inequities (2), resulting in the overrepresentation of Hispanic and nonwhite workers in frontline occupations (i.e., essential and direct-service) where risk for SARS-CoV-2 exposure might be higher than that associated with remote or nondirect–service work (4). In addition, Hispanic and nonwhite workers have less flexible work schedules and fewer telework options compared with white and non-Hispanic workers (5). Lack of job flexibility (i.e., ability to vary when to start and end work), lack of telework options, and unpaid or punitive sick leave policies might prevent workers from staying home and seeking care when ill, resulting in more workplace exposures, delayed treatment, and more severe COVID-19 outcomes (6,7). Whenever employers can provide flexible work schedules, nonpunitive paid sick leave, and telework options, they should offer this equitably to Hispanic and nonwhite workers.

The findings in this report are subject to at least six limitations. First, this analysis is not representative of all workplace outbreaks in Utah. Outbreaks might not be detected or

§ https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html; https://www.cdc.gov/niosh/emres/2019_ncov.html.

¶ https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/construction-workers.html.

** https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-manufacturing-workers-employers.html.

†† https://coronavirus.utah.gov/business/; https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

EXHIBIT 1
8 OF 12

Morbidity and Mortality Weekly Report

TABLE 1. Distribution of workplace outbreaks and workplace-associated COVID-19 cases, by North American Industry Classification System (NAICS) industry sector, and demographic characteristics of persons with workplace-associated COVID-19 and their outcomes — Utah, March 6–June 5, 2020

| NAICS Industry sector code | Industry sector | Workforce* | Workplace outbreaks | Workplace outbreak-associated cases | Workplace outbreak-associated incidence† | Hispanic or nonwhite§ | Admitted to hospital¶ | Severe outcomes¶ |
|---|---|---|---|---|---|---|---|---|
| | | | **Workers, outbreaks, and cases no. (%)** | | | **Characteristic no. (%)** | | |
| Overall total | — | 1,305,130 (100) | 210 (100) | 1,389 (100) | 106.4 | 970/1,335 (73) | 85/1,382 (6) | 40/1,155 (3) |
| 31–33 | Manufacturing | 137,579 (11) | 43 (20) | 467 (34) | 339.4 | 365/444 (82) | 25/464 (5) | 12/464 (3) |
| 42 | Wholesale Trade | 53,045 (4) | 29 (14) | 200 (14) | 377.0 | 145/190 (76) | 8/197 (4) | 3/197 (2) |
| 23 | Construction | 113,610 (9) | 32 (15) | 139 (10) | 122.3 | 97/135 (72) | 11/139 (8) | 7/139 (5) |
| 44, 45 | Retail Trade | 169,559 (13) | 28 (13) | 116 (8) | 68.4 | 78/113 (69) | 5/116 (4) | 1/116 (1) |
| 56 | Administrative, Support, and Waste Management | 95,878 (7) | 9 (4) | 114 (8) | 118.9 | 68/109 (62) | 8/114 (7) | 2/114 (2) |
| 72 | Accommodation and Food Services | 128,983 (10) | 25 (12) | 100 (7) | 77.5 | 78/97 (80) | 7/100 (7) | 7/100 (7) |
| 48, 49 | Transportation and Warehousing | 64,360 (5) | 10 (5) | 97 (7) | 150.7 | 71/94 (76) | 9/97 (9) | 6/97 (6) |
| 71 | Arts, Entertainment, and Recreation | 34,862 (3) | 6 (3) | 40 (3) | 114.7 | 14/39 (36) | 2/40 (5) | 0/40 (0) |
| 51, 54 | Professional, Scientific, Technical, and Information** | 151,275 (12) | 9 (4) | 47 (3) | 31.1 | 20/46 (43) | 5/47 (11) | 2/47 (4) |
| 52, 53, 92 | Finance, Real Estate, and Public Administration** | 147,220 (11) | 6 (3) | 24 (2) | 16.3 | 10/24 (42) | 1/23 (4) | 0/23 (0) |
| 81 | Other Services (except Public Administration) | 38,651 (3) | 8 (4) | 24 (2) | 62.1 | 13/23 (57) | 3/24 (13) | 1/24 (4) |
| 62 | Health Care and Social Assistance†† | 170,108 (13) | 5 (2) | 21 (2) | 12.3 | 11/21 (52) | 1/21 (5) | 0/21 (0) |

**Abbreviation:** COVID 19 = coronavirus disease 2019.
* Based on U.S. Census Quarterly Workforce Indicators, Utah 2019 (third quarter). https://qwiexplorer.ces.census.gov/static/explore.html#x=0&g=0.
† Cases per 100,000 workers. Estimated as workplace outbreak-associated COVID-19 cases per 100,000 workers in industry sector; does not include cases among workers not part of a workplace outbreak.
§ Among cases with known race and ethnicity (n = 1,335); Hispanic includes Hispanic or Latino; nonwhite includes the following (all non-Hispanic): black or African American, American Indian or Alaska Native, Asian, Native Hawaiian or Other Pacific Islander, two or more races, or other race groups.
¶ Among cases with known hospitalization (n = 1,382) and severity status (n = 1,155); severe outcome defined as intensive care unit admission, mechanical ventilation, or death.
** Because of small case numbers, Information (NAICS code 51) and Professional, Scientific, and Technical services (NAICS code 54) sectors were combined into a single category; Finance and Insurance (NAICS code 52), Real Estate and Rental and Leasing (NAICS code 53), and Public Administration (NAICS code 92) sectors were also combined into a single category.
†† The full name of this NAICS sector includes "Health Care"; however, because health care settings were not included in this analysis, they represent only social assistance businesses.

reported in smaller workplaces, and workers with self-limiting symptoms might not be tested. Outbreaks in nursing homes, detention centers, and education settings were not included in this analysis, and thus, the relative impact of COVID-19 in industry sectors represented by those workers were not assessed. Second, worker-to-worker transmission could not be confirmed; some workplace outbreak-associated cases will represent community and household transmission, or transmission between coworkers outside of work (e.g., commuting to work or social gatherings). Third, individual occupation data were unavailable, so assumptions about the types of affected workers (e.g., frontline workers) cannot be confirmed. Gathering detailed individual occupation data during case investigations might help inform more targeted risk-mitigation interventions within sectors by identifying types of work and workers at highest risk for SARS-CoV-2 infection. Fourth, the stay-at-home directives in effect in Utah during the study period likely differentially affected workplace attendance in different

sectors (e.g., more telework in information than in construction sectors); therefore, these findings might not be generalizable to states with different restriction levels and sector workforce distributions. Fifth, it is not known to what extent workers in these sectors were familiar with, able, and willing to follow guidance to prevent and reduce the spread of SARS-CoV-2. Finally, workforce estimates used to calculate the outbreak incidence rates by sector could not be adjusted to account for workers in health care, educational, and congregate-living settings that were excluded from this analysis, resulting in underestimated rates; outbreak incidence rates for the Educational Services sector (NAICS code 61) and Health Care and Social Services sector (NAICS code 62) were likely most affected by this limitation.

Understanding the distribution of workplace outbreaks across industry sectors can help health departments identify and target industries where additional guidance and intervention to mitigate SARS-CoV-2 transmission might be needed.

EXHIBIT 1
9 OF 12

Morbidity and Mortality Weekly Report

**TABLE 2. Characteristics of nonoutbreak–associated cases and workplace outbreak-associated cases of COVID-19 among persons aged ≥15 years — Utah, March 6–June 5, 2020.**

| Characteristic | Case status no. (%) | | P-value* |
| --- | --- | --- | --- |
| | Not outbreak–associated | Workplace outbreak–associated | |
| | (n = 8,297) | (n = 1,389) | |
| **Age group, yrs** | | | <0.001 |
| 15–24 | 1,718 (20.7) | 192 (13.8) | |
| 25–44 | 3,489 (42.1) | 658 (47.4) | |
| 45–64 | 2,360 (28.4) | 493 (35.5) | |
| ≥65 | 730 (8.8) | 46 (3.3) | |
| **Race/Ethnicity** | | | <0.001 |
| Hispanic or Latino | 3,303 (39.8) | 783 (56.4) | |
| White, non-Hispanic | 2,972 (35.8) | 365 (26.3) | |
| Native Hawaiian or Pacific Islander, non-Hispanic | 317 (3.8) | 61 (4.4) | |
| Asian, non-Hispanic | 194 (2.3) | 42 (3.0) | |
| Black or African American, non-Hispanic | 247 (3.0) | 38 (2.7) | |
| American Indian or Alaska Native, non-Hispanic | 309 (3.7) | 13 (0.9) | |
| Other, non-Hispanic | 237 (2.9) | 33 (2.4) | |
| Missing | 718 (8.7) | 54 (3.9) | |
| **Ethnicity** | | | <0.001 |
| Non-Hispanic | 4,279 (51.6) | 552 (39.7) | |
| Hispanic | 3,303 (39.8) | 783 (56.4) | |
| Missing | 715 (8.6) | 54 (3.9) | |
| **Sex** | | | <0.001 |
| Female | 4,088 (49.3) | 536 (38.6) | |
| Male | 4,199 (50.6) | 853 (61.4) | |
| Missing | 10 (0.1) | 0 (0) | |
| **Any chronic condition** | | | 0.24 |
| Yes | 2013 (24.3) | 318 (22.9) | |
| No | 1698 (20.5) | 298 (21.5) | |
| Missing | 4586 (55.3) | 773 (55.7) | |
| **Hospitalized** | | | 0.01 |
| Yes | 630 (7.6) | 85 (6.1) | |
| No | 7,136 (86.0) | 1,297 (93.4) | |
| Missing | 531(6.4) | 7 (0.5) | |
| **Severe outcome[†]** | | | 0.74 |
| Yes | 217 (2.6) | 40 (2.9) | |
| No | 5,618 (67.7) | 1,115 (80.3) | |
| Missing | 2,462 (29.7) | 234 (16.8) | |
| **ICU admission** | | | 0.94 |
| Yes | 195 (2.4) | 36 (2.6) | |
| No | 7,497 (90.4) | 1,341 (96.5) | |
| Missing | 605 (7.3) | 12 (0.9) | |
| **Mechanical ventilation** | | | 0.78 |
| Yes | 84 (1.0) | 14 (1.0) | |
| No | 7,111 (85.7) | 1,339 (96.4) | |
| Missing | 1,102 (13.3) | 36 (2.6) | |
| **Died** | | | 0.61 |
| Yes | 59 (0.7) | 9 (0.6) | |
| No | 5,947 (71.7) | 1,153 (83.0) | |
| Missing | 2,291 (27.6) | 227 (16.3) | |

**Abbreviations:** COVID-19 = coronavirus disease 2019; ICU = intensive care unit.
* P-values based on chi-squared tests and excludes missing categories; level of significance = p<0.05.
[†] Persons with COVID-19 were classified as having a severe outcome if they were admitted to an ICU, required mechanical ventilation, or died; they were classified as not having a severe outcome if they were not admitted to an ICU, did not require mechanical ventilation, and did not die.

EXHIBIT 1
10 oF 12

Morbidity and Mortality Weekly Report

## Summary

**What is already known about this topic?**

COVID-19 outbreaks occur within various workplaces.

**What is added by this report?**

During March 6–June 5, 2020, workplace outbreaks occurred in 15 Utah industry sectors; 58% of workplace outbreak-associated COVID-19 cases were in three sectors: Manufacturing, Wholesale Trade, and Construction. Despite representing 24% of Utah workers in all affected sectors, Hispanic and nonwhite workers accounted for 73% of workplace outbreak-associated COVID-19 cases.

**What are the implications for public health practice?**

Sector-specific COVID-19 guidance should be followed. Mitigation strategies should be culturally and linguistically responsive to racial/ethnic minority workers disproportionately affected by COVID-19. Collection of detailed case occupation data is needed to understand types of work where exposure risk is highest.

Further, health departments should consider obtaining case occupation data to better understand workplace outbreaks to inform more targeted interventions. The overrepresentation of Hispanic and nonwhite workers in frontline occupations has resulted in disproportionate disease incidence among racial/ethnic minority groups. Care must be taken to ensure that prevention and mitigation strategies are applied equitably and effectively using culturally and linguistically responsive materials, media, and messages to workers of racial and ethnic minority groups disproportionately affected by COVID-19.

## Acknowledgments

Utah's local county health department case investigators and COVID-19 surveillance staff members; COVID-19 task force and clearance reviewers, CDC.

Corresponding author: David Bui, pgz2@cdc.gov.

[1]Epidemic Intelligence Service, CDC; [2]Division of Environmental Health Science and Practice, National Center for Environmental Health, CDC; [3]Utah Department of Health, Salt Lake City, Utah; [4]Salt Lake County Health Department, Salt Lake City, Utah; [5]Summit County Health Department, Park City, Utah; [6]Southeast Utah Health Department, Price, Utah; [7]Davis County Health Department, Clearfield, Utah; [8]Weber-Morgan Health Department, Ogden, Utah; [9]Wasatch County Health Department, Heber, Utah.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

**FIGURE. Percentage point difference\* between the percentage of workers with workplace outbreak-associated COVID-19 who are Hispanic/Latino and nonwhite[†] and the percentage of Hispanic/Latino and nonwhite workers within the entire industry workforce,[§] by industry sector[¶] — Utah, March 6–June 5, 2020**



**Abbreviation:** COVID-19 = coronavirus disease 2019.

\* Sectors are sorted on absolute disparity between the percentage of Hispanic/Latino and nonwhite workers among workplace outbreak cases and the percentage of Hispanic/Latino and nonwhite workers in the overall industry workforce, in descending order.

[†] Nonwhite includes the following (all non-Hispanic): black or African American, American Indian or Alaska Native, Asian, Native Hawaiian or Other Pacific Islander, two or more races, or other race groups.

[§] Sector workforce demographics from U.S. Census Quarterly Workforce Indicators, Utah 2019 (third quarter); https://qwiexplorer.ces.census.gov/static/explore.html.

[¶] Industry sectors are based on the North American Industry Classification System (https://www.census.gov/eos/www/naics/). Because of small case numbers and similarities in sector processes and settings, Professional, Scientific, and Technical Services and Information sectors were combined into a single category, as were Finance and Insurance, Real Estate, Rental and Leasing, and Public Administration.

*EXHIBIT 1*
*11 OF 12*

Morbidity and Mortality Weekly Report

## References

1. US Census Bureau. QWI Explorer. Suitland, MD: US Department of Commerce, US Census Bureau; 2020. https://qwiexplorer.ces.census.gov/static/explore.html#x=0&g=0
2. Thakur N, Lovinsky-Desir S, Bime C, Wisnivesky JP, Celedón JC; Health Equality and Diversity Committee of the American Thoracic Society. The structural and social determinants of the racial/ethnic disparities in the U.S. COVID-19 pandemic: what's our role? Am J Respir Crit Care Med 2020. Epub July 17, 2020. https://doi.org/10.1164/rccm.202005-1523PP
3. Waltenburg MA, Victoroff T, Rose CE, et al.; COVID-19 Response Team. Update: COVID-19 among workers in meat and poultry processing facilities—United States, April–May 2020. MMWR Morb Mortal Wkly Rep 2020;69:887–92. https://doi.org/10.15585/mmwr.mm6927e2
4. Rho HJ, Brown H, Fremstad S; Center for Economic and Policy Research. A basic demographic profile of workers in frontline industries. Washington, DC: Center for Economic and Policy Research; 2020. https://cepr.net/wp-content/uploads/2020/04/2020-04-Frontline-Workers.pdf
5. Bureau of Labor Statistics. Economic news release: job flexibilities and work schedules—2017–2018 data from the American Time Use Survey. Washington, DC: US Department of Labor, Bureau of Labor Statistics; 2019. https://www.bls.gov/news.release/flex2.htm
6. Azar KMJ, Shen Z, Romanelli RJ, et al. Disparities in outcomes among COVID-19 patients in a large health care system in California. Health Aff (Millwood) 2020;39:1253–62. https://doi.org/10.1377/hlthaff.2020.00598
7. Tenforde MW, Billig Rose E, Lindsell CJ, et al.; CDC COVID-19 Response Team. Characteristics of adult outpatients and inpatients with COVID-19—11 academic medical centers, United States, March–May 2020. MMWR Morb Mortal Wkly Rep 2020;69:841–6. https://doi.org/10.15585/mmwr.mm6926e3

EXHIBIT 1
12 OF 12

## CONSENT FOR SARS-CoV-2 TESTING

The U.S. Centers for Disease Control and Prevention (CDC) is providing BOP with technical assistance for a BOP project intended to understand more about COVID-19 transmission and the protective behaviors and practices taken within correctional and detention facilities. You are invited to participate voluntarily in this project regarding COVID-19 transmission. Participation should take no more than 15 minutes of your time.

This project has two parts. First, we invite you to respond to a brief questionnaire including general information about yourself. The questionnaire should take no more than 10 minutes of your time.

Second, we will ask to conduct a nasopharyngeal swab test for SARS-CoV-2, the virus that causes COVID-19 illness. The test should take no more than 5 minutes of your time to complete. Risks of the procedure include mild discomfort, and possibly nose bleeding or dizziness. The results of the nasopharyngeal swab will be shared with BOP medical staff within 3 to 5 days. Test results will be shared back with you by appropriate BOP staff.

Participation in this project is voluntary. Testing results, demographic, and health information will be sent to the Arkansas Department of Health.

For any questions or concerns, contact eocevent206@cdc.gov with the subject line "Forrest City BOP."

By signing below, you are agreeing to participate in this project.


_____

*Printed name*


_____

*Signature*


_____

*Reg #*


_____

*Date*

EXHIBIT 2
1 OF 7

## CONSENTIMIENTO INFORMADO PARA EL VIRUS QUE CAUSA EL COVID-19

Los Centros para el Control y la Prevención de Enfermedades (CDC) están a brindar asistencia técnica a la agencia federal de prisiones para una investigación de brotes destinada a comprender la transmisión de COVID-19 en los centros correccionales y de detención. Usted está invitado a participar voluntariamente. Su participación no llevara más de 15 minutos.

El proyecto tiene dos partes. En la primera parte, lo invitamos a responder un breve cuestionario con información general. El cuestionario no llevara más de 10 minutos.

En la segunda parte, le invitamos a hacerse la prueba para detección del virus que causa COVID-19. Se toma una muestra de la nariz. La prueba no debe tomar más de 5 minutos. Los riesgos de la prueba son mínimos. Puede sentir una leve incomodidad y posiblemente puede salir un poco de sangre de la nariz. Los resultados se compartirán con el personal médico dentro de 3 a 5 días. Los resultados de las pruebas serán compartidos con usted por el personal apropiado de la agencia federal de prisiones.

Su participación es voluntaria. Los resultados de las pruebas, la información demográfica y de salud se enviarán al Departamento de Salud de Arkansas.

Si tiene cualquiera pregunta, comuníquese con eocevent206@cdc.gov con el asunto "Forrest City BOP".

Al firmar a continuación, acepta participar en esta investigación de brotes.

_____

*Nombre*

_____

*Firma*

_____

*Número de registro*

_____

*Fecha*



# FCC FORREST CITY
# INMATE BULLETIN

## COVID19 UPDATE

In the spirit of open and honest communication I wanted to inform each of you that inmates have recovered from COVID-19 will be returning to the housing units in the coming days. Rest assured your fellow inmates are no longer sick and have met all Center for Disease Control (CDC) criteria to be released from isolation.  Someone who has completed quarantine or been released from isolation does not pose a risk of infection to other people. Our medical personnel has even incorporated an additional 14 days past CDC guidance to ensure the inmates have recovered and to help protect your health.

The guidelines we have implemented for release are actually stricter that what the community is following.  As you can imagine they are ready to return to the housing units and we appreciate your cooperation and understanding as they move back in.  Please continue to practice social distancing, wear your cloth face covering, wash your hands frequently, and sleep head-to-foot.

**Together,** we will get through this!

_DeWayne Hendrix_                4/27/20

DeWayne Hendrix, Complex Warden        Date

EXHIBIT 2
2 OF 7

 # FCC FORREST CITY
# INMATE BULLETIN

## COVID19 UPDATE

At the onset of COVID-19, we partnered with an outside resource to respond to cases of COVID-19 at FCC Forrest City.  The outside resource assessed our planning, preparation and initial responses to COVID-19 within FCC Forrest City.  Recommendations were given to the staff and adhered to immediately thereafter.

A second visit with the outside source was conducted on April 21, 2020, to analyze the various aspects of transmission and examine testing strategies that might be useful in slowing transmission in a correction setting.

Plan moving forward:

Based on the visits, the outside resource established procedures to sample three (3) test pods **(STRICTLY VOLUNTARY)** at the low component in order to understand the spread of COVID-19 on the compound, beginning April 30, 2020.  The pods were chosen based on:

- The number of persons incarcerated who have tested positive on the compound; and

- The number of persons incarcerated within the pods; and

- The pods with the highest number of persons incarcerated who have chronic health conditions.

DeWayne Hendrix

4/29/20

DeWayne Hendrix, Complex Warden

Date

*EXHIBIT 2*
*3 OF 7*



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

May 7, 2020

**MEMORANDUM FOR ALL LOW COMPONENT INMATES**

FROM:           *DeWayne Hendrix*
                DeWayne Hendrix, Complex Warden

SUBJECT:        Asymptomatic Inmate COVID-19 Testing

Thanks for your continued patience and cooperation as we manage
the COVID-19 pandemic.  Unfortunately, there has been an
increased number in inmate cases within the Federal Bureau of
Prisons, and more specifically at the low component.

As each of you are aware, we began asymptomatic inmate testing
at the low component last Wednesday evening in Marianna Alpha
Unit.  In addition from April 30, 2020, through May 2, 2020,
several inmates in Marianna Delta, Wynne Bravo, and Helena Alpha
were also tested (asymptomatic).

Once we received the test results, through consultation with our
Regional Medical Team we created an asymptomatic positive pod
(Wynne Bravo) and asymptomatic negative pods (Marianna Alpha and
Helena Alpha).  All inmates who tested positive were moved to
Wynne Bravo and all inmates who were negative are now housed in
Marianna Alpha and Helena Alpha.

Our plan moving forward is to continue testing each pod and
create additional asymptomatic positive and asymptomatic
negative pods until we have tested the entire low component.
This strategy provides us with an opportunity to mitigate the
spread of COVID-19.

We will continue to conduct enhanced medical screenings daily to
include temperature checks and any inmate who becomes
symptomatic will be taken off the units, tested and placed in

EXHIBIT 2
4 OF 7



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

May 29, 2020

**MEMORANDUM FOR ALL LOW COMPONENT INMATES**

FROM:          DeWayne Hendrix, Complex Warden

SUBJECT:       Update: Asymptomatic Inmate COVID-19 Testing

Thanks for your continued patience and cooperation as we manage
the COVID-19 pandemic.

**Asymptomatic Inmate COVID-19 Testing**

As each of you are aware the following pods have been designated
as asymptomatic positive and asymptomatic negative pods after
the Center for Disease Control and Prevention (CDC) and our
facility conducted mass asymptomatic COVID-19 testing for
inmates from May 12-15, 2020.

**Asymptomatic Positive Pods**

Wynne Alpha, Wynne Bravo, and Wynne Delta

**Asymptomatic Negative Pods**

Helena Alpha, Helena Bravo, Helena Charlie, Helena Delta,
Marianna Alpha, Marianna Bravo, and Marianna Charlie.

Yesterday an inmate from Wynne Charlie became symptomatic and
was tested for COVID-19.  As a result this morning the health
services staff conducted cluster testing of inmates in Wynne
Charlie that were housed near that inmate and out of the eleven
tested, seven tested positive.  The positive inmates will be
housed in Vo-Tech, and the negative inmates will be housed in
the Visiting Room.

EXHIBIT 2
6 OF 7

BOP Coronavirus (COVID-19) Update
May 11, 2020
Page 2

As a result of the high rate of inmates who tested positive this morning, we will re-test the remainder of Wynne Charlie through an outside lab.  The specimens will be collected today, and Wynne Charlie will now be designated as an isolation pod until we receive the results of all inmates.

Additionally, earlier this morning an inmate from Marianna Alpha pod became symptomatic and was tested positive for COVID-19. The positive inmate will be housed in Vo-Tech.

As a result we will re-test the remainder of Marianna Alpha through an outside lab.  The specimens will be collected Monday, June 1, 2020, and Marianna Alpha will now be designated as an isolation pod until we receive the results of all inmates.

I want to also reiterate the importance of wearing the face coverings issued to you.  As we continue mitigate the spread of COVID-19, we will take the necessary administrative measures when any inmate are not adhering to these requirements.

As I stated in my memorandum to each of you on May 18, 2020, we will continue to conduct enhanced medical screenings daily to include temperature checks and any inmate who becomes symptomatic will be taken off the units, tested and placed in the appropriate isolation area pending the final results of their test.

Again, I realize this is a challenging situation, which is not optimal and/or perfect.  However, the ultimate objective is to minimize the opportunity for COVID-19 exposure and infection within our facility.  I appreciate each of your perseverance.

**Together** we will get through this!

EXHIBIT 2
2 of 7

 

August 4, 2020

The Honorable Mitch McConnell
Majority Leader
United States Senate
Washington, D.C. 20510

The Honorable Charles Schumer
Minority Leader
United States Senate
Washington, D.C. 20510

The Honorable Nancy Pelosi
Speaker
United States House of Representatives
Washington, D.C. 20515

The Honorable Kevin McCarthy
Minority Leader
United States House of Representatives
Washington, D.C. 20515

Dear Majority Leader McConnell, Speaker Pelosi, Minority Leader Schumer, and Minority
Leader McCarthy:

On behalf of The Leadership Conference on Civil and Human Rights, the American Civil
Liberties Union, and the Federal Public and Community Public Defenders, we urge you to
include critical provisions to protect the health and safety of incarcerated individuals in the
COVID-19 response package currently being negotiated.  The Leadership Conference is a
coalition charged by its diverse membership of more than 220 national organizations to promote
and protect civil and human rights in the United States; the American Civil Liberties Union is a
nationwide organization with more than 8 million members, activists, and supporters fighting
tirelessly in all 50 states, Puerto Rico, and Washington, D.C., to safeguard everyone's rights; and
the Federal Public and Community Defenders is an organization that, at any given time,
represents the vast majority of individuals facing federal prosecution. While the Coronavirus
Aid, Relief, and Economic Security (CARES) Act expanded the Federal Bureau of Prison's
(BOP) authority to release individuals to home confinement, BOP and the Department of Justice
(DOJ) have failed to exercise this authority. BOP and DOJ have been negligent in meeting
Congress' charge to quickly and safely reduce the prison population and minimize the spread and
harm of COVID-19 for incarcerated persons and correctional staff. Therefore, more is urgently
required to address the alarmingly high infection rates occurring in correctional facilities across
the nation.

As Congress works to provide additional relief for individuals impacted by the pandemic, it has a
moral obligation to extend that relief to all of our most vulnerable — the elderly, the sick, those
without medical care, and those unable to protect themselves from the virus — including those
who are incarcerated. We urge you to prioritize the health and wellbeing of incarcerated people
and their families by incorporating the five recommendations outlined below in the next stimulus
package.

EXHIBIT 3
1 OF 6

August 4, 2020
Page 2 of 6

All of us are at risk of contracting COVID-19 and the more than 2.2 million individuals currently incarcerated nationwide remain uniquely vulnerable. The unsanitary and overcrowded conditions in correctional facilities make it nearly impossible to appropriately disinfect surfaces or socially distance,[1] and access to quality medical care in many of these facilities has historically been lacking.[2] Further, high rates of underlying health issues among incarcerated populations place many individuals in custody in high-risk categories that make them more susceptible to complications if they do contract the virus.[3] One study found that incarcerated individuals are three times more likely to die and more than five times more likely to become infected than the general population.[4]

As coronavirus cases continue to surge across the country, prisons and jails have emerged as hotspots for outbreaks. Currently, the twelve largest known virus clusters are connected not to hard-hit nursing homes or meatpacking plants, but to correctional institutions.[5] Between mid-May and mid-June, the number of infections in prisons doubled and prison deaths increased by 73 percent.[6] More than 100,000 individuals in incarceration facilities have now contracted the virus, and at least 800 incarcerated individuals and correctional staff have died as a result.[7] While California state prisons and jails — which make up five of the twelve hotspots[8] — have recorded more than 7,700 coronavirus cases as of July 30, some states with significantly smaller incarcerated populations actually have significantly high infection rates.[9] For example, Kentucky's rate of 716 cases per 10,000 prisoners is actually slightly higher than California's rate of 702.[10] Last month, BOP recorded the death of the 100th federal prisoner,[11] and more are certainly to come in the weeks ahead.

---

[1] See, e.g., Morse, D. and Jouvenal, J. (Apr. 10, 2020). Inmates sharing sinks, showers and cells say social distancing isn't possible in Maryland prisons. THE WASHINGTON POST. https://www.washingtonpost.com/local/public-safety/inmates-sharing-sinks-showers-and-cells-say-social-distancing-isnt-possible-in-maryland-prisons/2020/04/10/5b1d5cf8-7913-11ea-9bee-c5bf9d2e3288_story.html

[2] See, e.g., Honderich, H. and Popat, S. (July 27, 2020). Coronavirus: Can this California prison save itself from Covid-19? BBC NEWS. https://www.bbc.com/news/world-us-canada-53476208; Novak, K. (July 9, 2020). Inmates Say Poor Conditions, Medical Care Continue at San Quentin. KCBS RADIO. https://kcbsradio.radio.com/articles/inmates-say-poor-conditions-continue-at-san-quentin

[3] U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. (Oct. 4, 2016). Special Report: Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[4] Carissimo, J. (July 11, 2020). Inmates are 5 times more likely to get coronavirus than the general population, study says. CBS NEWS. https://www.cbsnews.com/news/coronavirus-prison-inmates-more-likely-to-get-infected-study-says/

[5] Coronavirus in the U.S.: Latest Map and Case Count. (July 30, 2020). THE NEW YORK TIMES. https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters

[6] Williams, T., Seline, L., and Griesbach, R. (June 30, 2020). Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide. THE NEW YORK TIMES. https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html

[7] Coronavirus in the U.S.: Latest Map and Case Count. (July 30, 2020). THE NEW YORK TIMES. https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters

[8] Coronavirus in the U.S.: Latest Map and Case Count. (July 30, 2020). THE NEW YORK TIMES. https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters

[9] The Marshall Project. (July 30, 2020). A State-by-State Look at Coronavirus in Prisons. https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons

[10] Ibid.

[11] Hymes, C. (July 28, 2020). Federal prisons reach grim milestone: 100 inmate deaths from coronavirus. CBS NEWS. https://www.cbsnews.com/news/coronavirus-100-federal-prison-inmates-covid-deaths/

EXHIBIT 3
2 OF 6

August 4, 2020
Page 3 of 6

While these numbers are staggering, they almost certainly do not represent the actual number of infected individuals given the low number of tests conducted. At the federal level, BOP reports that it has completed testing for just 41,345 individuals as of August 4, despite overseeing a total of over 142,315 individuals in both BOP-managed and community-based facilities.[12] Similarly low rates of testing have occurred in state facilities, where Centers for Disease Control and Prevention (CDC) guidelines recommend testing only for symptomatic people and their close contacts in most cases, despite widespread knowledge of asymptomatic spread.[13] For example, as of mid-June, state prison systems in Illinois, Mississippi, and Alabama had tested less than 2.5 percent of incarcerated individuals, and testing of approximately 3 percent of individuals incarcerated in New York revealed that more than 40 percent were infected.[14] Failing to ensure the safety of individuals in our prisons and jails is not only an abdication of our societal responsibility to protect our most vulnerable, but a danger to our ability to effectively control the spread of COVID-19 and limit the damage this pandemic will cause.

Congress must take immediate action to provide for the protection, release, and safe reentry of incarcerated people. The actions taken in the last enacted stimulus package — the CARES Act on March 27, 2020, were a welcome step, but are far from enough. Despite the additional authority granted to it through the stimulus legislation, BOP has not meaningfully reduced its prison population in response to the pandemic. It has instead adopted exceedingly narrow criteria for determining individuals eligible for release,[15] rendering the directive to "immediately process" suitable candidates under the DOJ's April 3 memorandum ineffective.[16]

In the three weeks following that memo, BOP granted just 1,027 people home confinement, and reduced its prison population by just 3,400 individuals in the month of April — a number that falls below the pre-pandemic monthly average of 3,700 individuals despite including regularly occurring releases.[17] Fewer than 1,400 people were released from BOP-affiliated halfway houses between April 2 and April 25,[18] and fewer than 150 elderly or medically vulnerable prisoners

---

[12] U.S. Department of Justice, Federal Bureau of Prisons. *COVID-19 Coronavirus*.
https://www.bop.gov/coronavirus/
[13] Williams, T., Seline, L., and Griesbach, R. (June 30, 2020). *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*. THE NEW YORK TIMES. https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html; Centers for Disease Control and Prevention. (July 17, 2020). *Testing Overview*.
https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-
overview.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-
ncov%2Fhcp%2Fclinical-criteria.html
[14] Williams, T., Seline, L., and Griesbach, R. (June 30, 2020). *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*. THE NEW YORK TIMES. https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html
[15] Barr, L. and Mallin, A. (Apr. 24, 2020). *DOJ clarifies federal inmate release guidance after conduction plagues process*. ABC NEWS. https://abcnews.go.com/US/doj-clarifies-federal-inmate-release-guidance-confusion-plagues/story?id=70318981
[16] Memorandum from the Attorney General, U.S. Department of Justice, to Director, Bureau of Prisons, U.S. Department of Justice. (Apr. 3, 2020).
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf
[17] Neff, J. and Blakinger, K. (Apr. 25, 2020). *Few Federal Prisoners Released Under COVID-10 Emergency Policies*. THE MARSHALL PROJECT. https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies
[18] Ibid.

EXHIBIT 3
3 OF 6

August 4, 2020
Page 4 of 6

were granted compassionate release prior to April 2.[19] Now, more than four months after the
Attorney General's initial March 26 memo to prioritize the use of "statutory authorities to grant
home confinement" to individuals at high-risk for COVID-19,[20] BOP has continued to slow-walk
or fail to exercise its authority. It has released just 7,282 people to home confinement – a number
that appears to include regularly scheduled transfers in addition to those taken pursuant to
CARES Act authorities,[21] and at least 25 individuals have died while their requests for sentence
reductions were pending with the Bureau.[22] Moreover, the Bureau has continued to actively work
against decarceration for individuals, opposing or not responding to 48 of the 50 compassionate
release cases decided in early July, and agreeing to release before court intervention in just two
cases.[23]

It is therefore absolutely critical that Congress act swiftly to address the issues facing
incarcerated individuals in the next COVID-19 relief package. At a minimum, such legislation
should include:

1. **Provisions that will dramatically reduce pretrial and prison populations.** Congress
   should take action to ensure that additional individuals are being released, not detained,
   during a public health crisis. This means final COVID-19 relief legislation should include
   the Emergency Community Supervision Act (§191102 of the House-passed Health and
   Economic Recovery Omnibus Emergency Solutions (HEROES) Act)(S. 3646), which
   would mandate release or transfer to community supervision of individuals in federal
   prison or pretrial detention who are most at risk to contracting the virus and experiencing
   severe illness or death. The populations most at risk are those who are age 50 and older,
   have underlying health conditions, or are pregnant.

   Inclusion of the Emergency Community Supervision Act in the next relief bill would
   prevent deaths like that of Andrea High Bear, a mother who died shortly after being
   transferred from a jail in South Dakota to Carswell Federal Medical Center (FMC) in
   Texas, just 28 days after giving birth via C-section while on a ventilator. The 30-year-old
   member of the Cheyenne River Sioux Tribe in South Dakota was the first federally
   incarcerated woman to die from COVID-19. Rather than learn from that tragedy, BOP
   has permitted COVID-19 to rage at FMC Carswell: the facility now reports the second-
   highest rate of infection in the BOP.

---

[19] Ibid.
[20] Memorandum from the Attorney General, U.S. Department of Justice, to Director, Bureau of Prisons, U.S.
Department of Justice. (Mar. 26, 2020). https://www.bop.gov/resources/news/pdfs/20200405_covid-
19_home_confinement.pdf
[21] U.S. Department of Justice, Federal Bureau of Prisons. *COVID-19 Coronavirus*.
https://www.bop.gov/coronavirus/
[22] Moyer, J.W., and Satija, N. (Aug. 3, 2020). *Frail inmates could be sent home to prevent the spread of covid-19.
Instead, some are dying in federal prisons*. THE WASHINGTON POST. https://www.washingtonpost.com/local/public-
safety/frail-inmates-could-be-sent-home-to-prevent-the-spread-of-covid-19-instead-some-are-dying-in-federal-
prisons/2020/08/02/992fd484-b636-11ea-9b0f-c797548c1154_story.html?hpid=hp_hp-top-table-
main_virusdeadinmates-12pm%3Ahomepage%2Fstory-ans
[23] Ibid.

EXHIBIT 3
4 OF 6

August 4, 2020
Page 5 of 6

The Emergency Community Supervision Act would also modify probation and supervised release policies to be safer and less punitive and mandate the release of low-level pretrial defendants on their own recognizance.

2. **An expansion of court authority to release individuals in BOP Custody.** Congress should build upon the actions taken in the CARES Act by expanding the authority of courts to order compassionate release and reduce sentences for individuals incarcerated in the federal prison system. It should include in any relief package the COVID-19 Safer Detention Act (S. 4034), which would clarify the authority of courts to order compassionate release based on COVID-19 vulnerability, ensure that individuals sentenced before 1987 may seek compassionate release, and reduce the amount of time courts must wait before considering compassionate release motions during the coronavirus crisis.

Additionally, any negotiated legislation should include §191103(a)(1)-(3) of the HEROES Act, which would require courts to reduce the sentences of individuals most vulnerable to COVID-19 who do not pose a danger to society. The term "covered health condition" in that provision should be amended to cross-reference the CDC's list of individuals who might be at heightened risk of severe complications from COVID-19, in addition to existing enumerated health conditions, to allow flexibility in the law as medical understandings of COVID-19 continue to evolve.

3. **Increases in the availability of home detention for elderly people.** Our detention of elderly and other high-risk individuals who pose no danger was already inhumane and unhealthy but has become even more so amid the coronavirus pandemic. Over a quarter of the people who have died from COVID-19 while in BOP's care were seventy years or older.[24] Legislation should include provisions of the COVID-19 Safer Detention Act that improve and expand eligibility criteria for the First Step Act's Elderly Home Detention Pilot program, which permits the transfer of certain elderly and terminally ill prisoners from prison to home detention after serving a portion of their sentence.

4. **Provisions that facilitate essential communication with counsel.** Given the restrictions on in-person activities put in place to address the coronavirus pandemic, it is imperative that Congress include provisions in any legislation to ensure that individuals in custody retain the ability to speak with their attorneys confidentially and as necessary. The Effective Assistance of Counsel in the Digital Era Act (H.R. 5546) should be included in relief legislation to direct the Attorney General to put in place an electronic communication system for persons in federal custody that ensures confidential communication between attorneys and clients.

---

[24] Sentencing Resource Counsel for the Federal Public and Community Defenders. (July 30, 2030). *The Worsening COVID-19 Crisis in Federal Detention.*
https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/2020_07_30_covid_19_in_federal_detention_src_fact_sheet_v2.pdf

EXHIBIT 3
5 OF 6

August 4, 2020
Page 6 of 6

5. **Additional support at the federal, state, and local level to prevent, prepare for, and respond to coronavirus.** In the CARES Act, Congress provided $100 million in emergency funding to the federal prison system to respond to COVID-19. In forthcoming legislation, Congress should provide an additional $200 million to expand testing and other medical services, the provision of personal protective equipment and hygiene supplies, and sanitation services that are vital to maintaining the safety of the individuals who remain incarcerated as well as correctional staff. Congress should adopt language from the COVID-19 Correctional Facility Emergency Response Act (H.R. 6414/S. 3720), which would establish a grant program within DOJ to facilitate reentry planning and support and encourage correctional facility releases by states. Additional funding to prevent and mitigate COVID-19 risks for justice-involved youth, to ensure free access to COVID-19 testing, medical care, and sanitation for incarcerated and reentering individuals, and to provide support to reentering individuals should also be provided.

Congress must take action to protect the health and safety of every individual in our communities — including those who are incarcerated — in order to successfully slow the spread of COVID-19 and put the United States on the road to recovery. We urge Congress to ensure that the most vulnerable among us are not forgotten in the next coronavirus response package by including the critical provisions outlined above to protect, release, and provide safe reentry for incarcerated people.

If you have questions or concerns, please contact Sakira Cook, Director, Justice Reform Program, The Leadership Conference on Civil and Human Rights, at cook@civilrights.org; Kanya Bennett, Senior Legislative Counsel, ACLU, at kbennett@aclu.org; or Patricia Richman, National Sentencing Resource Counsel, Federal Public and Community Defenders, at Patricia_Richman@fd.org.


Sincerely,

The Leadership Conference on Civil and Human Rights
American Civil Liberties Union
The Federal Public and Community Public Defenders

EXHIBIT 3
6 of 6



30515-112
Gabriel Gonzalez
PO BOX 9000 Low
Federalcorrectionalcomplex
Forrest CITY, AR 72336
United States

Los Angeles P&DC 900
TUE 23 FEB 2021 PM

30515-112
Mccormack James
District Court Clerk
600 W Capitol AVE
Rm A149
Little ROCK, AR 72201-3325
United States

-R-T-S-    722015126-1N        02/23/21

RETURN TO SENDER
UNABLE TO FORWARD
UNABLE TO FORWARD
RETURN TO SENDER