IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

GABRIEL GONZALEZ              )
Reg. #30515-112                 )
                                   )
v.                                 )      No.  2:20CV00083-BSM-JTK
                                   )
JOHN P. YATES, Warden     )
FCC Forrest City              )

## SUPPLEMENTAL BRIEF OF WARDEN JOHN P. YATES

Comes now John P. Yates[1], Warden, Forrest City Correctional Institution, by and through his attorneys, Jonathan D. Ross, Acting United States Attorney for the Eastern District of Arkansas, and Shannon S. Smith, Assistant United States Attorney for said district, hereby files his Supplemental Brief pursuant to the Court's January 27, 2021, order.

## I.    Factual Background

Gabriel Gonzalez was convicted by a jury of three counts of Deprivation of Rights Under Color of Law related to him using his position as a law enforcement officer to force female victims to engage in non-consensual, sexual acts using force and threats, and he was sentenced to 360 months' imprisonment. United States District Court for the Central District of California (CDCA), Case No. 2:04-cr-01189, Docket Sheet, ECF No. 55, 100. His projected release date is September 17, 2031. (Ex. 1, Declaration of Associate Warden, Dr. Tanisha Hall at 1).

On April 13, 2020, Gonzalez filed a petition for relief under 28 U.S.C. § 2241 seeking temporary reassignment to home-confinement due to the COVID-19 pandemic. (Doc. 1). After briefing by the parties, the magistrate judge recommended the petition be dismissed without

---

[1] John P. Yates is the new warden of FCC Forrest City and replaces Dwayne Hendrix as Respondent in this action.

prejudice and a Certificate of Appealability be denied. (Doc. 3, 9, 10). On November 9, 2020, Gonzalez filed objections to the proposed findings and recommendations and a statement of necessity motion in this Court. (Doc. 13, 14). The Court rejected the proposed findings and recommendations of the magistrate judge and remanded for reconsideration in light of the information provided in Gonzalez's objection. (Doc. 16). After the parties filed additional responses and replies, the Court requested that Respondent brief the Court on the merits of Gonzalez's claim. (Doc. 29).

## II.   Law and Argument

### A.   Respondent provides the following information pursuant to the inquiries in the Court's January 27, 2021 Order.

#### 1. Why does Gonzalez's Clinical Encounter Report include a reference to "Inmate Wright"? *See Doc.* 13 at 25.

There is an entry in inmate Gonzalez's medical records dated June 10, 2020, where there is a reference to "inmate Wright." (Ex. 1 at 11). Gonzalez presented the Court with an incomplete portion of this clinical encounter record. *Id.* The excerpt Gonzalez submitted to the Court is marked with a large, bold watermark directing the reader to "See Amendment." *Id.* It is clear from the context that this was a scrivener's error. *Id.* Attached is a complete copy of the record, which was amended on June 11, 2020, to correct the error in question. *Id.*; (Declaration Exhibit N, Clinical Encounter (June 10, 2020, as amended June 11, 2020)).

#### 2. What is FCI-FC's process for screening and treating inmates who are COVID positive?

In spite of nationwide COVID-19 testing supply shortages, by mid-May 2020, with the exception of nine inmates who refused to be tested, all inmates at Forrest City Low were tested for COVID-19. (Ex. 1 at 5). These tests were conducted in cooperation with the CDC. *Id.* Inmates were tested regardless of whether they were symptomatic or asymptomatic. *Id.* The inmates that

refused testing, signed a Medical Treatment Refusal form stating they were refusing treatment recommended by the BOP and would be treated as positives. *Id.* Regular testing of inmates, as needed, has continued since then. *Id.*

Inmates who tested positive but who were asymptomatic were isolated for 14 days and monitored daily by the Health Services staff. *Id.* If they remained asymptomatic after 14 days they are considered recovered and removed from isolation. *Id.* On the other hand, if they develop symptoms, they will move into isolation, with other symptomatic inmates as described in the next paragraph or be transported to a hospital if needed. *Id.*

Inmates who tested positive but who were symptomatic were isolated for 14 days and monitored daily by the Health Services staff. *Id.* If the inmates' symptoms improved and they did not have symptoms for 14 consecutive days, are fever free for the last 3 days, and are on no antifebriles, the inmates were transitioned into the recovery area for an additional 14 days. *Id.* During the recovery phase, inmates are monitored for 14 additional days to ensure they are temperature and symptomatic free. *Id.* at 5-6. Inmates with no new symptoms are transitioned back to the general prison population after the South Central Region Medical Director reviews and approves each inmate to return to the general population. *Id.* at 6. Inmates with worsening symptoms may be sent to the hospital for treatment based on the level of care required. *Id.*

Following CDC guidance, inmates who receive a positive COVID-19 test result are not retested within a 90-day period following their positive test. *Id.* Over the twelve months of the Pandemic, of the approximately 1,000 inmates who have tested positive and recovered, there has been one known instance of an inmate who recovered from COVID-19 and later retested positive for it after the 90-day period. *Id.* There are ICU beds available at hospitals in the county where

Forrest City Low is located. *Id.* In addition, the institution is located approximately 45 minutes from Memphis, Tennessee, a major metropolitan area with hundreds of ICU beds. *Id.*

Following CDC recommendations, all inmates and staff at FCC Forrest City are provided masks and are required to wear them whenever social distancing is impractical. *Id.* Inmates and staff have their temperatures screened daily. *Id.* All inmates are provided with soap and are encouraged to wash their hands frequently. *Id.*

FCC Forrest City is in substantial compliance with all CDC requirements and recommendations for the mitigation of the spread of COVID-19. *Id.*

### 3. What steps has FCI-FC taken to limit the spread of COVID?

This section will address the following: BOP measures to limit the spread of COVID-19; specifics about the COVID-19 response at FCC Forrest City; and the current status of COVID-19 at FCC Forrest City.

<u>BOP Measures</u>

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. (Ex. 1 at 1). These steps include, but are not limited to the following:

a. Beginning August 5, 2020, BOP implemented Phase Nine of the Action Plan, which includes an extension of previously disseminated guidance and currently governs operations. *Id.* at 2. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. *Id.* Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. *Id.* Further, BOP has severely limited the movement of inmates and detainees among its facilities. *Id.*

4

Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions. *Id.*

b.  All staff and inmates have been and will continue to be issued an appropriate face covering and are required to wear the face covering when in public areas when social distancing cannot be achieved. *Id.*

c.  Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. *Id.* Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. *Id.* Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *Id.* Inmates who test positive for COVID-19 are quarantined from inmates who test negative for COVID-19. *Id.* In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. *Id.* Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. *Id.* A staff member with a stuffy or runny nose can be placed on leave by a medical officer. *Id.*

d.  Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. *Id.* All volunteer visits are suspended absent authorization by the Deputy Director of BOP. *Id.* Any contractor or volunteer who requires access will be screened for symptoms and risk factors. *Id.*

e.  Social and legal visits were suspended starting March 13, 2020, and remained suspended until approximately October 3, 2020, to limit the number of people entering the facility and interacting with inmates. *Id.* In order to ensure that familial relationships

are maintained during the suspension of social visits, BOP increased detainees' telephone allowance to 500 minutes per month. *Id.* at 3. Tours of facilities are also suspended. *Id.* Legal visits were permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors. *Id.*

f.  As a modification of the BOP's Phase Nine Action Plan, and in accordance with specific guidance designed to mitigate risks, social visits were reinstated in October and November 2020, where possible to maintain the safety of our staff, inmates, visitors, and communities. *Id.* Each individual institution made plans consistent with their institutional resources (including physical space) and will continuously monitor their visiting plan, and make prompt modifications, as necessary, to effectively manage COVID-19. *Id.*

g.  Within each institution, the BOP implemented modified operations to maximize social distancing in our facilities, as much as practicable. *Id.* To that end, inmates are limited in their movements to prevent congregate gathering and maximize social distancing. *Id.* Essential inmate work details, such as Food Service, continue to operate with appropriate screening. *Id.* Inmate movement in small numbers is authorized for the following purposes:

  i.   Commissary

  ii.  Laundry

  iii. Showers three times each week

  iv.  Telephone, both social and legal calls, and access to TRULINCs inmate email service.

*Id.* Inmate movement still allows for the provision of necessary mental health or medical care, including continued Sick Call. *Id.*

h.  Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp. *Id.*

COVID-19 response at FCC Forrest City

FCC Forrest City consists of three separate federal correctional institutions: a Satellite Prison Camp (SPC Forrest City), a Low Security Institution (FCI Forrest City Low), and a Medium Security Institution (FCI Forrest City Medium). *Id.* at 4.[2] On March 11, 2020, the State of Arkansas identified its first presumptive positive COVID-19 case. *Id.*; (Declaration Exhibit B, Press Release: Gov. Hutchinson Confirms State's First Presumptive Positive COVID-19 Case (Mar. 11, 2020), https://governor.arkansas.gov/news-media/pressrelcases/governor-hutchinson-confirms-states-first-presumptive-positi ve-covid-19-case.)

On March 13, 2020, although no inmates in the custody of the BOP had yet tested positive for COVID-19, the BOP initiated its Coronavirus (COVID-19) Phase Two Action Plan modifying all institution operations in order to mitigate the spread of COVID-19. *Id.*; (Declaration Exhibit C, Coronavirus (COVID-19) Phase Two Action Plan (Mar. 13, 2020)). That same day, the Complex Warden at FCC Forrest City issued the attached memorandum to the inmate population at FCC Forrest City notifying them of the changes in operations. *Id.*; (Declaration Exhibit D, Memorandum for FCC Forrest City Inmate Population (Mar. 13, 2020)). Continuing throughout the pandemic, the BOP has remained responsive to the changing information received from the

---

[2] Exhibits herein may include a reference to FOX (the institution code for FCC Forrest City), FOR (the institution code for FCI Forrest City Low, with satellite camp), and FOM (the institution code for FCI Forrest City Medium).

White House Coronavirus Taskforce, the Center for Disease Control and Prevention (CDC), and other federal and state health experts. *Id.* For example, while initial guidance did not recommend facemasks, when the CDC updated that guidance on April 3, 2020, the BOP issued all inmates reusable/washable facemasks. *Id.*

Throughout the Pandemic, FCC Forrest City has kept the inmate population informed of the changes in operations and made public each phase of the Coronavirus (COVID-19) action plan. *Id.* On April 8, 2020, the Warden issued an inmate bulletin notifying inmates of the fluidity of the situation on a national level and that the Complex was adapting operations according to information received from the Arkansas Department of Health and the Center for Disease Control and Prevention (CDC). *Id.*; (Declaration Exhibit E, *FCC Forrest City Inmate Bulletin COVID19 Update* (Apr. 8, 2020)). On May 21, 2020, the FCC Forrest City Environmental and Safety Compliance Department issued the Institution COVID-19 Sanitation Plan, which was promptly issued to all staff and inmates. *Id.*; (Declaration Exhibit F, *Sanitation Plan COVID-19* (May 21, 2020)). The Sanitation Plan outlines in detail the cleaning and disinfecting schedule that applied throughout the Complex. *Id.* It notes that FCC Forrest City is using four different disinfecting chemicals that are approved by the EPA for COVID-19 Cleaning and Disinfecting; each of which is made available to the inmate population for cleaning and sanitation. *Id.* at 4-5.

On June 10, 2020, FCC Forrest City issued additional reusable masks to the inmate population and reminded inmates on masking and other safety protocols. *Id.* at 5; (Declaration Exhibit G, *FCC Forrest City Inmate Bulletin Cloth Face Masks* (June 10, 2020)). As the Pandemic has progressed since then, FCC Forrest City has continued to inform and educate the inmate population on the changes to operations and the best practices for minimizing the spread of COVID-19. *Id.*; (See, e.g., Declaration Exhibit H, *FCC Forrest City Memorandum for All Inmates*

(Aug. 10, 2020)). Additionally, to better facilitate social distancing, the Bureau of Prisons has moved inmates from higher population facilities to institutions with lower population levels. *Id.* A nationwide review of Bureau of Prisons institutions identified FCC Forrest City as one of the higher population facilities, which resulted in the transfer of a number of inmates to other facilities. *Id.* Due to these transfers, social distancing is more achievable, and has contributed to FCC Forrest City's recent success in dramatically limiting the spread of COVID-19 in all three of the facilities in the Complex. *Id.*

Current Status of COVID-19 at FCC Forrest City

FCC Forrest City has done an excellent job implementing the COVID-19 precautions provided by the Bureau of Prisons in consultation with the CDC and other government agencies. As a result of these efforts, the spread of COVID-19 at FCC Forrest City has been dramatically reduced. (Ex. 1 at 6). The progress in vaccinations will only continue this positive trend. *Id.*

As of March 8, 2021, there are currently no active COVID-19 cases at FCI Forrest City Low or SPC Forrest City. *Id.* Over the course of the Pandemic, 743 inmates have tested positive for COVID-19 at FCI Forrest City Low and SPC Forrest City; all of these inmates have recovered. *Id.* There have been no deaths from COVID-19 at FCI Forrest City Low or SPC Forrest City. *Id.*; *See* COVID-19 Cases, https://www.bop.gov/coronavirus/ (last accessed Mar. 8, 2021) (when accessed, BOP.gov had not yet been updated to reflect the recovery of 3 inmates, though the update was made by the time of this Response). There is currently only one active COVID-19 case at FCI Forrest City Medium. *Id.* A total of 364 inmates have tested positive for COVID-19 at the Medium Institution; of these, 2 inmates died of complications related to COVID-19, and 361 inmates have recovered. *Id.*

With nearly a year's worth of data available, the fatality rate at FCC Forrest City from COVID-19 is lower than that in the surrounding community, despite FCC Forrest City testing its entire population. *Id.* at 7. For example, at FCI Forrest City Low and SPC Forrest City, the fatality rate per 1000 is 0. *Id.* At FCI Forrest City Medium, the fatality rate is 5.49 per 1,000. *Id.* In St. Francis County, Arkansas, there have been 3,198 total positive COVID-19 cases and 32 deaths, resulting in a fatality rate of 10.01 per 1,000. *Id.*; *see* Ark. Dep't Health, COVID-19 County Data (last updated Mar. 8, 2021), https://www.healthy.arkansas.gov/programs-services/topics/covid-19-county-data. In the state of Arkansas as whole, there have been 324,951 total COVID-19 cases and 5,387 deaths, resulting in a fatality rate of 16.60 per 1,000 positive cases. *Id.*; *see* Ark. Dep't Health, COVID-19 Update (Mar. 8, 2021), https://www.healthy.arkansas.gov/programs-services/topics/novel-coronavirus. In the entire United States, there have been 29,042,262 positive cases and 526,020 deaths, resulting in a fatality rate of 18.11 per 1,000 positive cases. *Id.*; *see* "COVID-19 Dashboard," Johns Hopkins University: Center for Systems Science and Engineering (CSSE) (last updated Mar. 9, 2021, 9:26 AM), https://coronavirus.jhu.edu/map.html.[3]

FCC Forrest City has begun vaccinating staff and inmates with COVID-19 vaccines. *Id.* Currently at FCC Forrest City, at least 175 staff members and 123 inmates have been fully inoculated (i.e., received both doses). *Id.* (The number of staff inoculations is incomplete, as staff members who receive vaccinations in the community rather than at FCC Forrest City are not reflected in this number.) *Id.*

During the first week of March, FCC Forrest City received its second round of vaccine allotments. *Id.* Approximately additional 590 inmates received their first vaccine dose. *Id.* The

---

[3] Relying on the formula for calculating cause-specific death rate, an example of which can be found at U. Texas School of Public Health: CHARTing Health Information: Rates & Formulas, https://libguides.sph.uth.tmc.edu/charting_health/data_formulas (last accessed March 9, 2021).

Federal Bureau of Prisons COVID-19 Vaccine Guidance is publicly available at https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. *Id.*; (Declaration Exhibit I). Accordingly, approximately 713 inmates at FCC Forrest City have received at least one dose of the vaccine. *Id.*

The Bureau of Prisons has been engaged in an active promotional campaign encouraging inmates to receive the vaccination and addressing all questions and concerns they may have. *Id.* On February 24, 2021, nationwide, including at FCC Forrest City, all inmates received an Inmate Immunization Handout notifying them that in the coming weeks they will be offered the COVID-19 vaccine and seeking to answer any concerns. *Id.*; (Declaration Exhibit J, *Inmate Immunization Handout TRULINKS* (Feb. 24, 2021)).

On January 28, 2021, United States Army Major General Christopher J. Sharpsten, Deputy Director for Supply, Production and Distribution for the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed), recognized the BOP for leading all jurisdictions and Federal entities in its rate of vaccine utilization, having the highest percentage of vaccines administered per doses allocated across all of the United States. *Id.* at 8. Over 71,241 doses of the COVID-19 vaccine have been delivered to staff and inmates at more than half of BOP correctional facilities across the country. *Id.*; "COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/ (last accessed Mar. 9, 2021, 10:25 AM). With the recent emergency use authorization for the Johnson & Johnson vaccine, it is expected that the number of vaccinations available for inmates will significantly increase. *Id.*

**4. Have there been any recorded instances of COVID reinfection at FCI-FC?**

This has not been a meaningful issue at FCI Forrest City Low. Over the twelve months of the Pandemic, of the approximately 1,000 inmates who have tested positive and recovered, there

has been one known instance of an inmate who recovered from COVID-19 and later retested positive after the 90-day period. (Ex. 1 at 6).

**5. What is FCI-FC's sick call process? How long does it take to respond to sick calls?**

To provide proper medical care to each of the approximately 2,600 inmates at FCC Forrest City, there is a Triage process known as "Sick Call" for the classification of patients according to priority of need for examination and treatment. (Ex. 1 at 8). Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment. *Id.*; (Declaration Exhibit K, *Patient Care, Program Statement 6031.04(17)* (June 3, 2014) (excerpted), a full version is available publicly at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query#).

For inmates with chronic conditions, the BOP has Chronic Care Clinics, "which are a means for inmates with ongoing medical needs to be tracked and seen by a health care provider at clinically appropriate intervals. (Ex. 1 at 8). A physician will see all inmates assigned to a CCC every 12 months, or more often if clinically indicated. *Id.* The frequency of CCC follow-up care will be determined based on clinical need and communicated to the inmate's primary [Midlevel Practitioner], who will provide this care." *Id*; (Declaration Exhibit K, P.S. 6031.04(15)). During the Coronavirus pandemic, the Health Services Unit at FCC Forrest City, like medical providers across the world, were confronted with a significant disruption in the provision of medical care to its patient population. (Ex. 1 at 8). The Health Services staff have gone above and beyond to take care of and protect the inmates under their care. *Id*. Despite the heroic efforts of the medical staff, the unprecedented challenges resulted in a backlog of Sick Call requests during the initial lockdown in the first few months of the pandemic. *Id*. While urgent requests were prioritized and

responded to immediately, routine sick call requests, such as complaints about mild, chronic conditions such as GERD, did result in long wait times. *Id.* at 9.

To maintain social distancing in the Health Services Unit at the Low Institution, only nine inmates may be seen at a time. *Id.* Additionally, inmates in quarantine or isolation cannot be seen at Health Services but must be seen in their cells. *Id.* For months, a majority of the Health Services medical staff's time was spent going to units to do pill line, insulin, pill pick-up, and temperature checks. *Id.* In the past months, the Advanced Practice Providers have made significant progress working through the backlog. *Id.*

> **6. Did FCI-FC change its policy regarding medication available in both prescription and over-the-counter form (such as Omeprazole) to now require inmates to purchase that medication from the commissary?**
> **a.  If so, what prompted this change?**
> **b.  Must all inmates using Omeprazole now purchase it through the commissary or are there exceptions for those who have it prescribed?**
> **c.  How much Omeprazole can an inmate purchase from the commissary during one visit?**
> **d.  How often does the commissary restock its supply of Omeprazole?**

There have been no changes to the OTC Medication policy since November 17, 2004. *Id.* at 10. There have been changes to the operation of the Commissary during the course of the Pandemic that have impacted how inmates receive their OTC medications. *Id.*

Just as over-the-counter medications are treated differently from prescription medications outside of prison, the same holds true within the BOP. *Id.* at 9. The Program Statement governing Over-the-Counter Medications permits inmates "improved access to OTC medications by making them available for sale in the commissary." *Id.* The OTC medications are treatments for cosmetic and general hygiene issues or symptoms of minor medical ailments. *Id.* By making these available to inmates at the institutional commissary through personal resources, the BOP is able to focus its Health Services resources on more serious conditions without limiting inmates' access to these

13

medications. *Id.*; (Declaration Exhibit L, *Over-the-Counter Medication, Program Statement 6541.02* (Nov. 17, 2004), available publicly at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query#).

The medication inmate Gonzalez complains about, Omeprazole (commonly sold under the brand name Prilosec), has been sold in the FCC Forrest City Commissary since at least December 2018. *Id.*; (Declaration Exhibit M, *FCC Forrest City Commissary List* (Dec. 2018), available publicly at https://www.bop.gov/locations/institutions/for/fox_commlist121918.pdf). Thus, Omeprazole falls within the OTC Medications policy and is an OTC medication that inmates will generally be required to purchase with personal resources. *Id.*

The OTC Medication policy makes exception for indigent inmates as well as certain chronic conditions:

> H2/PPI's: **Non-indigent inmates must purchase all OTC strength "Ranitidine or Omeprazole" from the commissary (for: Relief of heartburn, acid indigestion, sour stomach, pm use, QD use for Ranitidine and GERD) unless they are being actively followed in a chronic care clinic with documented findings to justify use of these medications for the following: Severe GERD, Zollinger-Ellison Syndrome, Schatzki's Ring, Barrett's Esophagitis, Esophageal Stricture, Hiatal Hernia, Previous GI Bypass or Ulcer Surgery, chronic oral steroid use in transplants, Documentation of Chronic need for NSAIDS with Prior History of GI Bleed and Short-Term Treatment of H. Pylori.

*Id.* While an inmate who is indigent or who is on a chronic care clinic for Severe GERD will receive their OTC medications from the Pharmacy, non-indigent inmates with GERD and other routine conditions will be required to purchase their OTC medications from the Commissary. *Id.* at 10. If Health Services determines that an inmate "has an immediate medical need which must be addressed before his or her regularly scheduled commissary visit" then the inmate may obtain OTC medications at sick call from the Pharmacy. *Id.*; (Declaration Exhibit M). The Pharmacy at FCC Forrest City implements the OTC Medication policy in coordination with Health Services. *Id.* With the addition of a new Pharmacist at FCC Forrest City in early 2020, inmate prescriptions

were reviewed and those who were required to purchase their OTC medications with personal funds were required to do so. *Id.*

To accommodate the limited Commissary availability to help prevent the spread of COVID-19, in September 2020, the purchase limit was increased from one package of 14-dose Omeprazole to two packages. *Id.* The Commissary monitors its inventory of all items, including Omeprazole, and places orders whenever current inventories are low. *Id.* at 10. The FCC Forrest City Commissary has had some issues with vendors running out of stock or not delivering Omeprazole on time. *Id.* at 11. When the Commissary runs out of an OTC medication, it notifies the Pharmacy and Health Services, who will then provide the necessary medications to the inmates. *Id.*

In April 2020, the Food and Drug Administration (FDA) recalled one of the most widely used, over-the-counter gastrointestinal acid medication, Ranitidine, commonly sold under the brand name Zantac. *Id.* FDA News Release, FDA Requests Removal of All Ranitidine Products (Zantac) from the Market (Apr. 1, 2020), https://www.fda.gov/news-events/press-announcements/fda-requestsremoval-all-ranitidine-products-zantac-market. This resulted in significantly increased demand for similar antacid medicines, including Omeprazole, which contributed to the Commissary's difficulty receiving timely shipments from its vendors. (Ex. 1 at 11).

In June 2020, inmate Gonzalez's prescription for Omeprazole was reviewed and it was determined that he fell under the OTC Medication policy and was required to purchase his own OTC medications with personal resources. *Id.* at 12. Since August 2020, inmate Gonzalez has purchased Omeprazole from the Commissary six times. *Id.*; (Declaration Exhibit Q, Gonzalez Commissary Receipts). As noted, inmate Gonzalez had the opportunity to purchase two packages

of Omeprazole each time he went to the Commissary. *Id.* But as is apparent from his receipts, inmate Gonzalez chose to purchase other items instead of purchasing a second package of Omeprazole. *Id.* As can be seen from the available balance notated on his Commissary receipts, inmate Gonzalez is not indigent. *Id.*

**7. How often are inmates allowed to visit the commissary per month? Are there exceptions to this rule?**

Throughout the Pandemic, the FCC Forrest City has done an excellent job of maintaining access for inmates, while remaining flexible and careful to limit the spread of COVID-19. (Ex. 1 at 10). Before the Pandemic, inmates were able to shop at the Commissary once a week. *Id.* During modified operations, it was reduced to once a month. *Id.* For the past month or two, the Commissary has returned to permitting inmates to shop at the Commissary once a week. *Id.*

During the Pandemic, access to Commissary had to be limited to prevent the spread of COVID-19. *Id.* When inmates were unable to receive their OTC Medications from the Commissary, the Pharmacy provided these medications to the inmates without charge. *Id.* Whenever inmates had access to the Commissary, the OTC Medications policy remained in full effect and inmates were required to purchase these medications from the Commissary. *Id.* To accommodate the limited Commissary availability, in September 2020, the purchase limit was increased from one package of 14-dose Omeprazole to two packages. *Id.*

**8. Has Gonzalez received a renewal of his Methimazole prescription?**

Regarding Gonzalez's Methimazole prescription, it was discontinued on June 29, 2020 as laboratory results showed that it was not clinically indicated. (Ex. 1 at 12; Declaration Exhibit R, Clinical Encounter (June 29, 2020)). Follow-up labs were taken in October 2020, and the results were within normal ranges. His thyroid disorder condition was determined to be in remission. (Ex.

1 at 12; Declaration Exhibit S, Clinical Encounter (Feb. 23, 2021)). Labs will continue to be taken and if clinically indicated, he will be prescribed appropriate medication. *Id.*

**B. Gonzalez's Eighth Amendment claims have no merit.**

In his original petition, Gonzalez requested "reassignment to a temporary home-confinement setting for the duration of [the pandemic]." (Doc. 1). Based on Gonzalez's objections to the magistrate judge's findings and recommendations, the Court has construed his claim as one for immediate release under § 2241 due to alleged unconstitutional conditions of confinement. However, other courts in the Eighth Circuit have found jurisdiction does not exist if the claim relates to "conditions of confinement" within a § 2241 petition, even under circumstances surrounding the pandemic. *See, e.g.*, *Malcom v. Starr*, No. 0:20-cv-02503 (D. Minn. Mar. 11, 2021) (Doc. 108) ("'The authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court.'" (quoting *Brown v. Plata*, 563 U.S. 493, 500 (2011) (citing 18 U.S.C. § 3626(a)))), adopting, in part, report and recommendation, Doc. 85, 2021 WL 190870 (Jan. 15, 2021).

Gonzalez argues that the prison is executing his sentence under cruel and unusual standards due to exposure to the COVID-19 virus. He asserts that the standard in *Farmer v. Brennan*, 511 U.S. 825 (1994) applies, specifically that an official "knows of and disregards an excessive risk to inmate health and safety." Gonzalez attempts to proceed on his claim under a standard where an official knows of and disregards an excessive risk to inmate health and safety. However, Gonzalez alleges not that the BOP disregards risk; rather, Gonzalez states that the BOP "is unable to provide safety" and that the alleged conditions remain "despite prison official's motives." (Doc. 1). He has

not made the requisite showing that prison officials have acted with a culpable mental state of deliberate indifference.

To prove an Eighth Amendment violation related to medical needs or conditions of confinement, a detainee must show both an objective component and a subjective component. *Farmer*, 511 U.S. at 832-834 (citations omitted). To establish the objective component of an Eighth Amendment claim, a detainee must do more than make "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused," a detainee must also convince the court that "society considers the risk that the [detainee] complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).

To establish the subjective component of an Eighth Amendment claim, a detainee must show that detention officials have acted with the "culpable" mental state of "deliberate indifference" with respect to the detainee's medical needs or conditions of confinement. *Farmer*, 511 U.S. at 834-840 (describing "deliberate indifference" as akin to subjective criminal recklessness); *see also*, *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993) ("deliberate indifference" is a "highly culpable state of mind approaching actual intent"). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. When detention officials have "responded reasonably" to a "substantial risk to inmate health or safety, even if the harm ultimately [is] not averted," those officials cannot be found to have acted with deliberate indifference. *Farmer*, 511 U.S. at 844 (citing *Helling*, 509 U.S. at 33) (further citations omitted).

The existence of the COVID-19 pandemic does not render a prisoner's incarceration cruel and unusual, nor does the fact alone that a prisoner becomes ill while incarcerated; instead, the prison must demonstrate deliberate indifference towards a prisoner's serious medical needs.

    **1.   BOP responded appropriately to Gonzalez's COVID-19 positive test.**

Gonzalez asserts that the FCC Forrest City was aware he tested positive for the COVID-19 virus and provided him no treatment, that he was never asked if he had symptoms, and that the prison placed him in a quarantine housing dorm with 160 other infected prisoners. He alleges that reinfection is likely and raises concern about long-term damage from the virus. Gonzalez claims that "[a]ny additional stressors [to his medical conditions], such as the contraction of the COVID-19 virus, would severely over-tax his fluctuating physical health and would significantly increase his likely chances of death." (Doc. 1). However, he tested positive for the virus and had no symptoms, and there is no indication his health has worsened or that he suffers long-term effects as a result.

As part of FCC Forrest City's Pandemic response, Health Services engaged in mass testing for COVID-19 for surveillance screening of the inmate population regardless of symptoms. (Ex. 1 at 11). Gonzalez was tested on May 13, 2020, and the CDC confirmed that the sample was positive for COVID-19 on May 29, 2020. *Id.*; (Declaration Exhibit O, Admin. Note Lab Report & CDC Test Results (May 29, 2020)). While in isolation and COVID-19 quarantine, Gonzalez was screened daily for COVID-19 symptoms, including temperature tests. *Id.* The medical record shows that over the 14 consecutive days of daily screening, Gonzalez denied symptoms and registered a temperature within normal range. *Id.*; (Declaration Exhibit P, Vitals All (May 21, 2020 – June 4, 2020)). On June 10, 2020, it was noted that Gonzalez had been without symptoms for over 14 days, and thus met the CDC guidelines for release from isolation. *Id.*; (Declaration Exhibit

N). Based upon Gonzalez's self-reporting at the time and the clinical indications through daily screening, Gonzalez remained asymptomatic through his infection with COVID-19. *Id.*

As more fully described above, BOP and FCC Forrest City implemented significant measures to protect the health of inmates and staff. Gonzalez's medical records substantiate that he was being monitored, that he showed no symptoms, that once he tested positive, he was quarantined to prevent spread of the virus, that he continued to be monitored, and that subsequently he tested negative on June 23, 2020. (Doc. 18, Exhibit 6). According to medical records, in the months following his COVID-19 positive test, he had multiple clinical encounters. *Id.* Gonzalez was monitored and received treatment following his positive test for which he was asymptomatic.

Gonzalez takes issue with being quarantined with multiple other inmates. Although prisons are confined spaces and are not ideally suited for social distancing, "the inability to practice effective social distancing is not, in and of itself, sufficiently serious to implicate a violation of the Eighth Amendment." *Rodriguez-Francisco v. White*, No. 1:20-CV-1076, 2020 WL 4260766, at *3 (M.D. Pa. July 24, 2020) (cleaned up). "CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic." *Engelund v. Doll*, 4:20-CV-604, 2020 WL 1974389, at *9 (M.D. Pa. Apr. 4, 2020) (Finding that petitioner failed to establish deliberate indifference by prison officials where reasonable steps were taken to limit the spread of COVID-19, including modified lockdown, cleaning and sanitization measures, and isolation of COVID-19-positive inmates).

Quarantine measures at FCC Forrest City are implemented pursuant to BOP policy. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. (Ex. 1 at 2). Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release

from isolation. *Id.* Inmates who test positive for COVID-19 are quarantined from inmates who test negative for COVID-19. *Id.*

Gonzalez expresses concern about being infected by the virus a second time and alleges that reinfection is "not only possible, but likely." (Doc. 13). According to the CDC, reinfection is rare. *See* https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html. While the science and data concerning COVID-19 antibodies and reinfection rates is still evolving, there is at least some potential for reinfection, but "the analysis regarding reinfection is the same as the risk of infection from COVID-19 generally." *United States v. Manzo*, No. 2:07-CR-02042-LRS-2, 2020 WL 6786898, at *3 (E.D. Wash. Nov. 18, 2020). Thus, the measures taken by FCC Forrest City to mitigate and prevent the spread of COVID-19 also work to benefit prisoners who have already been infected with the virus from being reinfected. Furthermore, over the twelve months of the pandemic, of the approximately 1,000 inmates who have tested positive and recovered, there has been only one known instance of an inmate who recovered from COVID-19 and later retested positive after the 90-day period. (Ex. 1 at 6). Gonzalez's contention that reinfection is "likely" is speculative at best and, given the measures undertaken by BOP and FCC Forrest City in the face of the pandemic, does not reflect deliberate indifference on the part of Respondent. Also, as more and more inmates receive the vaccine at FCC Forrest City—at last count over 700—Gonzalez's concerns seem less realistic and more of a desire not to let a crisis go to waste. *Id.* at 7.

**2. BOP has properly addressed Gonzalez's medical conditions.**

Gonzalez asserts that he has three serious medical conditions that are worsened by BOP policy and FCC-Forrest City's handling of the COVID-19 pandemic. He argues that he was denied prescription medication for his gastroesophageal reflux condition and instead must purchase medication at the commissary, that his sick calls were unanswered, that he has been denied medical

care unless it is purchased, and that he has not received his hypothyroidism medication in several months. Gonzalez also references his ocular disorder but does not allege in his objections this condition has been inadequately addressed by prison officials.

Gonzalez points out that he has gastroesophageal reflux disease (GERD)—commonly known as acid reflux or heartburn conditions—and cites a study for the proposition that GERD patients who take proton pump inhibitor (PPI) medication such as Omeprazole could have an increased risk of contracting COVID-19. (Doc. 13). He argues that "GERD places patients at an elevated risk for COVID suffering and morbidity." *Id.* The science about this is evolving and not clear-cut. At least one article interpreting the observational study to which Gonzalez cites finds that the absolute risk of developing COVID while taking PPIs is "quite small" and, in the face of the study, recommends that patients not stop taking PPIs if they are currently prescribed them. *See* https://www.massgeneral.org/news/coronavirus/heartburn-and-covid-19.

Gonzalez asserts he has been denied his acid reflux medication, Omeprazole, and is required to purchase it. "The Eighth Amendment does not guarantee free medical care." *Gorman v. Fries*, No. 3:08-CV-151, 2008 WL 4911197, at *4 (N.D. Ind. Nov. 13, 2008); *see also Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir.1997). As more fully addressed above, Omeprazole (commonly sold under the brand name Prilosec), has been sold in the FCC Forrest City Commissary since at least December 2018. (Ex. 1 at 9; Declaration Exhibit M, FCC Forrest City Commissary List (Dec. 2018), available publicly at https://www.bop.gov/locations/institutions/for/fox_commlist121918.pdf). Thus, Omeprazole falls within the OTC Medications policy and is an OTC medication that inmates will generally be required to purchase with personal resources. *Id.*

Although the OTC Medication policy makes exception for indigent inmates as well as certain chronic conditions, non-indigent inmates with GERD and other routine conditions will be required to purchase their OTC medications from the Commissary. *Id.* at 9-10. 54. In June 2020, Gonzalez's prescription for Omeprazole was reviewed and it was determined that he fell under the OTC Medication policy and was required to purchase his own OTC medications with personal resources. *Id.* at 12. As can be seen from the available balance notated on his Commissary receipts, inmate Gonzalez is not indigent. *Id.*; (Declaration Exhibit Q, Gonzalez Commissary Receipts). Since August 2020, Gonzalez has purchased Omeprazole from the Commissary six times. *Id.* As noted, he had the opportunity to purchase two packages of Omeprazole each time he went to the Commissary, but as is apparent from his receipts, he chose to purchase other items instead of purchasing a second package of Omeprazole. *Id.*

Gonzalez also alleges he has been regularly denied sick-call requests to address his medical concerns. In response to the COVID-19 pandemic, BOP and FCC Forrest City implemented modified operations to maximize social distancing, as much as practicable. (Ex. 1 at 3). To that end, inmates are limited in their movements to prevent congregate gathering and maximize social distancing, but inmate movement still allows for the provision of necessary mental health or medical care, including continued Sick Call. *Id.*

To provide proper medical care to each of the approximately 2,600 inmates at FCC Forrest City, there is a Triage process known as "Sick Call" for the classification of patients according to priority of need for examination and treatment. *Id.* at 8. Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment. *Id.*; (Declaration Exhibit K, Patient Care, Program Statement 6031.04(17) (June 3, 2014) (excerpted), a full version is available publicly at

https://www.bop.gov/PublicInfo/execute/policysearch?todo=query#). Despite the heroic efforts of the medical staff, the unprecedented challenges resulted in a backlog of Sick Call requests during the initial lockdown in the first few months of the pandemic. *Id.* While urgent requests were prioritized and responded to immediately, routine sick call requests, such as complaints about mild, chronic conditions such as GERD, did result in long wait times. *Id.* at 9. Nevertheless, according to medical records, in the months following his COVID-19 positive test, Gonzalez received medical attention several times through multiple clinical encounters. (Doc. 18, Exhibit 6).

Additionally, Gonzalez argues that his hyperthyroidism has been left untreated, creating a danger to his health. He claims that the discontinuation of his hyperthyroid medication Methimazole is "downright criminal." (Doc. 13). The record refutes his claims. Regarding his Methimazole prescription, it was discontinued on June 29, 2020 as laboratory results showed that it was not clinically indicated. (Ex. 1 at 12; Declaration Exhibit R, Clinical Encounter (June 29, 2020)). Follow-up labs were taken in October 2020, and the results were within normal ranges. *Id.* His thyroid disorder condition was determined to be in remission. *Id.*; (Declaration Exhibit S, Clinical Encounter (Feb. 23, 2021). Labs will continue to be taken and if clinically indicated, he will be prescribed appropriate medication. *Id.*

In other words, although Gonzalez was diagnosed with hyperthyroidism in December of 2019, he was placed on medication, when his labs were retaken in June of 2020, his results were normal, and it was determined that his hyperthyroidism medication was not needed because his thyroid condition was determined to be in remission. He has not been denied medication or treatment, and there is nothing "downright criminal" about discontinuing a medication since his labs are now normal.

**3. Gonzalez's broad claims that BOP has inadequately handled the COVID-19 pandemic in its prisons are without merit.**

Gonzalez alleges that he is being denied his right to safety and is being held under conditions posing a serious risk of harm as a result BOP's handling of the pandemic. While claiming that BOP is unprepared to protect the health and safety of inmates, he also complains of being subjected to restrictive conditions caused by BOP's efforts to curb the spread of COVID-19. He claims that the facility ceased providing or did not adequately provide soap and hygiene products, that medical treatment is scant, and that inmates cannot avoid close contact to others due to confinement. However, BOP has taken a number of steps in response to the pandemic in order to abate its effects and implemented a sanitation plan in response to the virus. Gonzalez has not established a substantial risk of serious harm from these alleged deprivations nor has he shown deliberate indifference amounting to a "highly culpable state of mind approaching actual intent." *Choate*, 7 F.3d at 1374 (8th Cir. 1993).

Measures taken to ameliorate risk of infection from COVID-19, such as placing inmates with COVID-19 symptoms in insolation and suspending transfers between facilities, represent a reasonable response to the risk posed by the virus and do not demonstrate prison officials have intentionally disregarded a known risk or failed to take measures to address it. *Blackburn v. Noble*, No. 3:20-CV-00046-GFVT, 2020 WL 4758358 (E.D. Ky. Aug. 17, 2020). Courts have found that similar mitigation efforts by prisons amount to a reasonable response to the risks created by the COVID-19 pandemic. *See Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020) (per curiam); *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam); *Wilson v. Williams*, 961 F.3d 829, 841–42 (6th Cir. 2020).

As described more fully above, BOP has instituted a multi-phased action plan in response to the pandemic in order to abate its effects while also fulfilling its mandate of incarcerating persons sentenced or detained based on judicial orders. FCC Forrest City has implemented the

BOP Plan, which is currently in Phase 9 and was last modified on November 25, 2020. *See* https://www.bop.gov/coronavirus/covid19_status.jsp. The BOP Plan includes aggressive measures aimed at preventing and mitigating the risk of COVID-19 transmission into and inside BOP facilities.

Pursuant to CDC recommendations, all inmates and staff at FCC Forrest City are provided masks and are required to wear them whenever social distancing is impractical, inmates and staff have their temperatures screened daily, and all inmates are provided with soap and are encouraged to wash their hands frequently. (Ex. 1 at 6). Continuing throughout the pandemic, the BOP has remained responsive to the changing information received from the White House Coronavirus Taskforce, the Center for Disease Control and Prevention (CDC), and other federal and state health experts. *Id.* at 4. For example, while initial guidance did not include facemasks, when the CDC updated that guidance on April 3, 2020, the BOP issued all inmates reusable/washable facemasks. *Id.* Routine Testing of inmates, as needed, has been in place since May, 2020. *Id.* at 5.

Throughout the Pandemic, FCC Forrest City has kept the inmate population informed of the changes in operations and made public each phase of the COVID-19 action plan. *Id.* at 4. On May 21, 2020, the FCC Forrest City Environmental and Safety Compliance Department issued the Institution COVID-19 Sanitation Plan, which was promptly issued to all staff and inmates and outlines in detail the cleaning and disinfecting schedule that applied throughout the Complex. *Id.*; (Declaration Exhibit F, Sanitation Plan COVID-19 (May 21, 2020)).

Despite Gonzalez's allegation that medical treatment has been scant in the face of the pandemic, medical treatment of prisoners is onoing. The process for sick calls is more fully described above. Although the Health Services Unit at FCC Forrest City was not immune to the significant disruptions affecting healthcare providers worldwide due to the Coronavirus pandemic,

the Health Services staff have gone above and beyond to take care of and protect the inmates under

their care. *Id*. at 8. Despite the heroic efforts of the medical staff, the unprecedented challenges

resulted in a backlog of Sick Call requests during the initial lockdown in the first few months of

the pandemic. *Id.* While urgent requests were prioritized and responded to immediately, routine

sick call requests, such as complaints about mild, chronic conditions such as GERD, did result in

long wait times. *Id.* at 9.

To maintain social distancing in the Health Services Unit at the Low Institution, only nine

inmates may be seen at a time. *Id.* Additionally, inmates in quarantine or isolation cannot be seen

at Health Services but must be seen in their cells. *Id.* For months, a majority of the Health Services

medical staff's time was spent going to units to do pill line, insulin, pill pick-up, and temperature

checks. *Id.* In the past months, the Advanced Practice Providers have made significant progress

working through the backlog. *Id.*

Although Gonzalez argues that BOP has failed to stop the outbreak, the data shows that

BOP has made impressive strides in battling the virus. As of March 8, 2021, there are currently no

active COVID-19 cases at FCI Forrest City Low or SPC Forrest City. *Id.* at 6. Over the course of

the Pandemic, 743 inmates have tested positive for COVID-19 at FCI Forrest City Low and SPC

Forrest City; all of these inmates have recovered, and there have been no deaths from COVID-19.

at FCI Forrest City Low or SPC Forrest City. *Id.* At FCI Forrest City Medium, there is currently

only one active COVID-19 case. *Id.* A total of 364 inmates have tested positive for COVID-19 at

the Medium Institution; of these, 2 inmates died of complications related to COVID-19, and 361

inmates have recovered. *Id*.

Gonzalez cites an Occupational Safety and Health Act (OSHA) complaint filed against

BOP by Council Prison Locals 33 on March 31, 2020, for the contention that BOP's handling of

the COVID-19 pandemic is inadequate. (Doc. 13 at 6, 55-59). Gonzalez incorrectly casts this as a "report and findings" that are critical of BOP, when in fact it is made up of allegations filed under OSHA approximately one year ago. *Id.* The OSHA complaint does not address FCC Forrest City specifically but instead lists FCC Forrest City among roughly 100 facilities that have been "affected by this complaint." (Doc. 13 at 58-59). As the Court reasoned in its Order, "Gonzalez's habeas claim is based on the conditions of *his* confinement, so any references to … federal prisons other than FCI-FC have no bearing on his case." (Doc. 29). The complaint was filed on behalf of BOP staff against BOP at-large nearly one year ago, thus the Court should not consider a wide-ranging claim against 99 other BOP facilities in adjudicating Gonzalez's petition. Further, as described above, it appears many of the allegations in the OSHA complaint have been addressed and remedied in the one year since it was filed as there are currently no active COVID-19 cases at FCI Forrest City Low or SPC Forrest City, one active case at FCI Forrest City Medium, at least 175 staff members and 123 inmates have been fully inoculated (i.e., received both vaccine doses), and 590 inmates have received their first vaccine dose. *Id.* at 6-7.

Gonzalez has not demonstrated that the plan adopted by the BOP and implemented by FCC Forrest City is inadequate to either manage the outbreak or provide treatment for inmates who fall ill. *See United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. March 19, 2020). Prison officials have responded reasonably to the pandemic with an extensive range of measures aimed at preventing and mitigating effects of the virus. Gonzalez cannot satisfy the subjective component of his Eighth Amendment claims because he cannot establish that the officials at his facility have acted with deliberate indifference with regard to any of his claims.

Moreover, Respondent notes that Gonzalez received a 30-year sentence due to a conviction of abusing his position of trust as a law enforcement officer by forcing victims into non-consensual,

sexual acts, and he would present a danger to the community if released. Gonzalez's request for home confinement pursuant to the CARES Act was denied by Respondent, in part, on the grounds that he did not fit the criteria due to his conviction for a sex offense and history of violence. *See* CDCA Case No. 2:04-cr-01189, Doc. 206-1. Given that Gonzalez has failed to meet the requirements to establish an Eighth Amendment violation, and considering he poses a possible danger to the community if released, his petition should be denied.

In the face of a worldwide pandemic, BOP and FCC Forrest City has responded with rigorous measures to prevent the spread of the virus, to protect inmates and staff, and to provide ongoing medical care as needed. Gonzalez has not demonstrated that, in the fact of these thorough measures, BOP and FCC Forrest City have acted with a "culpable" mental state of "deliberate indifference" with respect to his medical needs or conditions of confinement.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that Gonzalez's petition be denied.

Respectfully submitted,
JONATHAN D. ROSS,
Acting United States Attorney
By: SHANNON S. SMITH
Bar No. 94172
Assistant U.S. Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
shannon.smith@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 12, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I further certify that on said date, I sent by U.S. Mail a copy of this filing to:

GABRIEL GONZALEZ
#30515-112
FORREST CITY - LOW
FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. Box 9000
FORREST CITY, AR 72336

By: SHANNON S. SMITH
    Bar No. 94172
    Assistant U.S. Attorney
    P.O. Box 1229
    Little Rock, AR 72203
    (501) 340-2600
    shannon.smith@usdoj.gov