IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

| | |
|---|---|
| GABRIEL GONZALEZ ) | |
| Reg. #30515-112 ) | |
| ) | |
| v. ) | No. 2:20CV00083-BSM-JTK |
| ) | |
| DEWAYNE HENDRIX, Warden ) | |
| FCC Forrest City ) | |

## DECLARATION OF DR. TANISHA HALL

I, Dr. Tanisha Hall, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

### I. Introduction

1. I am currently employed by the Federal Bureau of Prisons (BOP) of the United States Department of Justice, as an Associate Warden, at the Federal Correctional Complex in Forrest City, Arkansas (FCC Forrest City). I have been employed by the BOP since September, 1994, and have held my current position as Associate Warden since December, 2018.

2. The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

3. Gabriel Gonzalez, Reg. No. 30515-112, is a 53-year-old federal inmate currently incarcerated at FCC Forrest City, Low Institution. Inmate Gonzalez has a projected release date of September 17, 2031, via good conduct time. He has been incarcerated at FCC Forrest City, Low Institution since August 1, 2013. *See* Exhibit A, *Public Information Inmate Data*.

4. This declaration is made in response to the Court's inquiry regarding FCC Forrest City's COVID-19 mitigation measures, and the various other conditions of confinement issues addressed in the Court's January 27, 2021 order.

### II. Measures to Protect Inmate and Staff Safety

5. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. These steps include, but are not limited to the following:

a. Beginning August 5, 2020, BOP implemented Phase Nine of the Action Plan, which includes an extension of previously disseminated guidance and currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions.

b. All staff and inmates have been and will continue to be issued an appropriate face covering and are required to wear the face covering when in public areas when social distancing cannot be achieved.

c. Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. Inmates who test positive for COVID-19 are quarantined from inmates who test negative for COVID-19. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

d. Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

e. Social and legal visits were suspended starting March 13, 2020, and remained suspended until approximately October 3, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships

Declaration of Dr. Hall | 2

    are maintained during the suspension of social visits, BOP increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits were permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

f. As a modification of the BOP's Phase Nine Action Plan, and in accordance with specific guidance designed to mitigate risks, social visits were reinstated in October and November 2020, where possible to maintain the safety of our staff, inmates, visitors, and communities. Each individual institution made plans consistent with their institutional resources (including physical space) and will continuously monitor their visiting plan, and make prompt modifications, as necessary, to effectively manage COVID-19.

g. Within each institution, the BOP implemented modified operations to maximize social distancing in our facilities, as much as practicable. To that end, inmates are limited in their movements to prevent congregate gathering and maximize social distancing. Essential inmate work details, such as Food Service, continue to operate with appropriate screening. Inmate movement in small numbers is authorized for the following purposes:

   i. Commissary
   ii. Laundry
   iii. Showers three times each week
   iv. Telephone, both social and legal calls, and access to TRULINCs inmate email service.

   Inmate movement still allows for the provision of necessary mental health or medical care, including continued Sick Call.

h. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### III.     Specifics about the COVID-19 Response at FCC Forrest City

6. FCC Forrest City consists of three separate federal correctional institutions: a Satellite Prison Camp (SPC Forrest City), a Low Security Institution (FCI Forrest City Low), and a Medium Security Institution (FCI Forrest City Medium).

7. On March 11, 2020, the State of Arkansas identified its first presumptive positive COVID-19 case. *See* Exhibit B, *Press Release: Gov. Hutchinson Confirms State's First Presumptive Positive COVID-19 Case* (Mar. 11, 2020), https://governor.arkansas.gov/news-media/press-releases/governor-hutchinson-confirms-states-first-presumptive-positive-covid-19-cas.

8. On March 13, 2020, although no inmates in the custody of the BOP had yet tested positive for COVID-19, the BOP initiated its Coronavirus (COVID-19) Phase Two Action Plan modifying all institution operations in order to mitigate the spread of COVID-19. *See* Exhibit C, Coronavirus (COVID-19) Phase Two Action Plan (Mar. 13, 2020).

9. That same day, the Complex Warden at FCC Forrest City issued the attached memorandum to the inmate population at FCC Forrest City notifying them of the changes in operations. *See* Exhibit D, *Memorandum for FCC Forrest City Inmate Population* (Mar. 13, 2020).

10. Continuing throughout the pandemic, the BOP has remained responsive to the changing information received from the White House Coronavirus Taskforce, the Center for Disease Control and Prevention (CDC), and other federal and state health experts. For example, while initial guidance did not include facemasks, when the CDC updated that guidance on April 3, 2020, the BOP issued all inmates reusable/washable facemasks.

11. Throughout the Pandemic, FCC Forrest City has kept the inmate population informed of the changes in operations and made public each phase of the Coronavirus (COVID-19) action plan. On April 8, 2020, the Warden issued an inmate bulletin notifying inmates of the fluidity of the situation on a national level and that the Complex was adapting operations according to information received from the Arkansas Department of Health and the Center for Disease Control and Prevention (CDC). *See* Exhibit E, *FCC Forrest City Inmate Bulletin COVID19 Update* (Apr. 8, 2020).

12. On May 21, 2020, the FCC Forrest City Environmental and Safety Compliance Department issued the Institution COVID-19 Sanitation Plan, which was promptly issued to all staff and inmates. *See* Exhibit F, *Sanitation Plan COVID-19* (May 21, 2020). The Sanitation Plan outlines in detail the cleaning and disinfecting schedule that applied throughout the Complex. It notes that FCC Forrest City is using four different disinfecting chemicals that are approved by the EPA for COVID-19

Cleaning and Disinfecting; each of which is made available to the inmate population for cleaning and sanitation.

13. On June 10, 2020, FCC Forrest City issued additional reusable masks to the inmate population and reminded inmates on masking and other safety protocols. *See* Exhibit G, *FCC Forrest City Inmate Bulletin Cloth Face Masks* (June 10, 2020). As the Pandemic has progressed since then, FCC Forrest City has continued to inform and educate the inmate population on the changes to operations and the best practices for minimizing the spread of COVID-19. *See, e.g.*, Exhibit H, *FCC Forrest City Memorandum for All Inmates* (Aug. 10, 2020).

14. Additionally, to better facilitate social distancing, the Bureau of Prisons has moved inmates from higher population facilities to institutions with lower population levels. A nationwide review of Bureau of Prisons institutions identified FCC Forrest City as one of the higher population facilities, which resulted in the transfer of a number of inmates to other facilities. Due to these transfers, social distancing is more achievable, and has contributed to FCC Forrest City's recent success in dramatically limiting the spread of COVID-19 in all three of the facilities in the Complex.

### IV. COVID-19 Testing and Screening

15. In spite of nationwide COVID-19 testing supply shortages, by mid-May 2020, with the exception of nine inmates who refused to be tested, all inmates at Forrest City Low were tested for COVID-19. These tests were conducted in cooperation with the CDC. Inmates were tested regardless of whether they were symptomatic or asymptomatic. The inmates that refused testing, signed a Medical Treatment Refusal form stating they were refusing treatment recommended by the BOP and would be treated as positives. Regular testing of inmates, as needed, has continued since then.

16. Inmates who tested positive but who were asymptomatic were isolated for 14 days and monitored daily by the Health Services staff. If they remained asymptomatic after 14 days they are considered recovered and removed from isolation. On the other hand, if they develop symptoms, they will move into isolation, with other symptomatic inmates as described in the next paragraph or be transported to a hospital if needed.

17. Inmates who tested positive but who were symptomatic were isolated for 14 days and monitored daily by the Health Services staff. If the inmates' symptoms improved and they did not have symptoms for fourteen consecutive days, and are fever free for the last three days, and are on no antifebriles the inmates were transitioned into the recovery area for an additional 14 days. During the recovery phase, inmates are monitored for 14 additional days to ensure they are temperature and

symptomatic free. Inmates with no new symptoms are transitioned back to the general prison population after South Central Region Medical Director reviews and approves each inmate to return to the general population. Inmates with worsening symptoms may be sent to the hospital for treatment based on the level of care required.

18. Following CDC guidance, inmates who receive a positive COVID-19 test result are not retested within a 90-day period following their positive test. Over the twelve months of the Pandemic, of the approximately 1,000 inmates who have tested positive and recovered, there has been one known instance of an inmate who recovered from COVID-19 and later retested positive for it after the 90-day period.

19. There are ICU beds available at hospitals in the county where Forrest City Low is located. In addition, the institution is located approximately 45 minutes from Memphis, Tennessee, a major metropolitan area with hundreds of ICU beds.

20. Following CDC recommendations, all inmates and staff at FCC Forrest City are provided masks and are required to wear them whenever social distancing is impractical. Inmates and staff have their temperatures screened daily. All inmates are provided with soap and are encouraged to wash their hands frequently.

21. FCC Forrest City is in substantial compliance with all CDC requirements and recommendations for the mitigation of the spread of COVID-19.

## V.  Current Status of COVID-19 at FCC Forrest City

22. FCC Forrest City has done an excellent job implementing the COVID-19 precautions provided by the Bureau of Prisons in consultation with the CDC and other government agencies. As a result of these efforts, the spread of COVID-19 at FCC Forrest City has been dramatically reduced. The progress in vaccinations will only continue this positive trend.

23. As of March 8, 2021, there are currently no active COVID-19 cases at FCI Forrest City Low or SPC Forrest City. Over the course of the Pandemic, 743 inmates have tested positive for COVID-19 at FCI Forrest City Low and SPC Forrest City; all of these inmates have recovered. There have been no deaths from COVID-19 at FCI Forrest City Low or SPC Forrest City. *See* COVID-19 Cases, https://www.bop.gov/coronavirus/ (last accessed Mar. 8, 2021) (when accessed, BOP.gov had not yet been updated to reflect the recovery of 3 inmates).

24. There is currently only 1 active COVID-19 case at FCI Forrest City Medium. A total of 364 inmates have tested positive for COVID-19 at the Medium Institution; of these, 2 inmates died of complications related to COVID-19, and 361 inmates have recovered. *See id.*

25. With nearly a year's worth of data available, the fatality rate at FCC Forrest City from COVID-19 is lower than that in the surrounding community, despite FCC Forrest City testing its entire population. For example, at FCI Forrest City Low and SPC Forrest City, the fatality rate per 1000 is 0. At FCI Forrest City Medium, the fatality rate is 5.49 per 1,000. In St. Francis County, Arkansas, there have been 3,198 total positive COVID-19 cases and 32 deaths, resulting in a fatality rate of 10.01 per 1,000. *See* Ark. Dep't Health, COVID-19 County Data (last updated Mar. 8, 2021), https://www.healthy.arkansas.gov/programs-services/topics/covid-19-county-data. In the state of Arkansas as whole, there have been 324,951 total COVID-19 cases and 5,387 deaths, resulting in a fatality rate of 16.60 per 1,000 positive cases. *See* Ark. Dep't Health, COVID-19 Update (Mar. 8, 2021), https://www.healthy.arkansas.gov/programs-services/topics/novel-coronavirus. In the entire United States, there have been 29,042,262 positive cases and 526,020 deaths, resulting in a fatality rate of 18.11 per 1,000 positive cases. *See* "COVID-19 Dashboard," Johns Hopkins University: Center for Systems Science and Engineering (CSSE) (last updated Mar. 9, 2021, 9:26 AM), https://coronavirus.jhu.edu/map.html.[1]

26. FCC Forrest City began vaccinating staff and inmates with COVID-19 vaccines. Currently at FCC Forrest City, 175* staff members and 123 inmates have been fully inoculated (i.e., received both doses). (*This number is incomplete, as staff members who receive vaccinations in the community rather than at FCC Forrest City are not reflected in this number.)

27. During the first week of March, FCC Forrest City received its second round of vaccine allotments. Approximately additional 590 inmates received their first vaccine dose. The Federal Bureau of Prisons COVID-19 Vaccine Guidance, a copy of which is attached as Exhibit I to this declaration, is publicly available at https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Accordingly, approximately 713 inmates at FCC Forrest City have received at least one dose of the vaccine.

28. The Bureau of Prisons has been engaged in an active promotional campaign encouraging inmates to receive the vaccination and addressing all questions and concerns they may have. On February 24, 2021, nationwide, including at FCC Forrest City, all inmates received an Inmate

---

[1] Relying on the formula for calculating cause-specific death rate, an example of which can be found at U. Texas School of Public Health: CHARTing Health Information: Rates & Formulas, https://libguides.sph.uth.tmc.edu/charting_health/data_formulas (last accessed March 9, 2021).

Declaration of Dr. Hall | 7

Immunization Handout notifying them that in the coming weeks they will be offered the COVID-19 vaccine and seeking to answer any concerns. *See* Exhibit J, *Inmate Immunization Handout TRULINKS* (Feb. 24, 2021).

29. On January 28, 2021, United States Army Major General Christopher J. Sharpsten, Deputy Director for Supply, Production and Distribution for the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed), recognized the BOP for leading all jurisdictions and Federal entities in its rate of vaccine utilization, having the highest percentage of vaccines administered per doses allocated across all of the United States.

30. Over 71,241 doses of the COVID-19 vaccine have been delivered to staff and inmates at more than half of BOP correctional facilities across the country. "COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/ (last accessed Mar. 9, 2021, 10:25 AM). With the recent emergency use authorization for the Johnson & Johnson vaccine, it is expected that the number of vaccinations available for inmates will significantly increase.

## VI.   Inmate Access to Medical Care

31. To provide proper medical care to each of the approximately 2,600 inmates at FCC Forrest City, there is a Triage process known as "Sick Call" for the classification of patients according to priority of need for examination and treatment. Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment. *See* Exhibit K, *Patient Care, Program Statement 6031.04(17)* (June 3, 2014) (excerpted), a full version is available publicly at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query#.

32. For inmates with chronic conditions, the BOP has Chronic Care Clinics, "which are a means for inmates with ongoing medical needs to be tracked and seen by a health care provider at clinically appropriate intervals. A physician will see all inmates assigned to a CCC every 12 months, or more often if clinically indicated. The frequency of CCC follow-up care will be determined based on clinical need and communicated to the inmate's primary [Midlevel Practitioner], who will provide this care." *Id.* Exhibit K, P.S. 6031.04(15).

33. During the Coronavirus pandemic, the Health Services Unit at FCC Forrest City, like medical providers across the world, were confronted with a significant disruption in the provision of medical care to its patient population. The Health Services staff have gone above and beyond to take care of and protect the inmates under their care.

34. Despite the heroic efforts of the medical staff, the unprecedented challenges resulted in a backlog of Sick Call requests during the initial lockdown in the first few months of the pandemic. While urgent requests were prioritized and responded to immediately, routine sick call requests, such as complaints about mild, chronic conditions such as GERD, did result in long wait times.

35. To maintain social distancing in the Health Services Unit at the Low Institution, only nine inmates may be seen at a time. Additionally, inmates in quarantine or isolation cannot be seen at Health Services but must be seen in their cells. For months, a majority of the Health Services medical staff's time was spent going to units to do pill line, insulin, pill pick-up, and temperature checks. In the past months, the Advanced Practice Providers have made significant progress working through the backlog.

### VII. Over-the-Counter Medications

36. Just as over-the-counter medications are treated differently from prescription medications outside of prison, the same holds true within the BOP. The Program Statement governing Over-the-Counter Medications permits inmates "improved access to OTC medications by making them available for sale in the commissary." The OTC medications are treatments for cosmetic and general hygiene issues or symptoms of minor medical ailments. By making these available to inmates at the institutional commissary through personal resources, the BOP is able to focus its Health Services resources on more serious conditions without limiting inmates' access to these medications. *See* Exhibit L, *Over-the-Counter Medication*, *Program Statement 6541.02* (Nov. 17, 2004), available publicly at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query#.

37. The medication inmate Gonzalez complains about, Omeprazole (commonly sold under the brand name Prilosec), has been sold in the FCC Forrest City Commissary since at least December 2018. *See* Exhibit M, *FCC Forrest City Commissary List* (Dec. 2018), available publicly at https://www.bop.gov/locations/institutions/for/fox_commlist121918.pdf. Thus Omeprazole falls within the OTC Medications policy and is an OTC medication that inmates will generally be required to purchase with personal resources.

38. The OTC Medication policy makes exception for indigent inmates as well as certain chronic conditions:

> H2/PPI's: **Non-indigent inmates must purchase all OTC strength "Ranitidine or Omeprazole" from the commissary (for: Relief of heartburn, acid indigestion, sour stomach, prn use, QD use for Ranitidine and GERD) unless they are being actively followed in a chronic care clinic with documented findings to justify use of these

Declaration of Dr. Hall | 9

medications for the following: Severe GERD, Zollinger-Ellison Syndrome, Schatzki's Ring, Barrett's Esophagitis, Esophageal Stricture, Hiatal Hernia, Previous GI Bypass or Ulcer Surgery, chronic oral steroid use in transplants, Documentation of Chronic need for NSAIDS with Prior History of GI Bleed and Short-Term Treatment of H. Pylori.

39. While an inmate who is indigent or who is on a chronic care clinic for Severe GERD will receive their OTC medications from the Pharmacy, non-indigent inmates with GERD and other routine conditions will be required to purchase their OTC medications from the Commissary.

40. If Health Services determines that an inmate "has an immediate medical need which must be addressed before his or her regularly scheduled commissary visit" then the inmate may obtain OTC medications at sick call from the Pharmacy. *Id.* Exhibit M.

41. The Pharmacy at FCC Forrest City implements the OTC Medication policy in coordination with Health Services. With the addition of a new Pharmacist at FCC Forrest City in early 2020, inmate prescriptions were reviewed and those who were required to purchase their OTC medications with personal funds were required to do so.

42. There have been no changes to the OTC Medication policy since November 17, 2004. There have been changes to the operation of the Commissary during the course of the Pandemic that have impacted how inmates receive their OTC medications.

### VIII. Commissary Access during COVID-19 Modified Operations

43. Throughout the Pandemic, the FCC Forrest City has done an excellent job of maintaining access for inmates, while remaining flexible and careful to limit the spread of COVID-19.

44. Before the Pandemic, inmates were able to shop at the Commissary once a week. During modified operations, it was reduced to once a month. For the past month or two, the Commissary has returned to permitting inmates to shop at the Commissary once a week.

45. During the Pandemic, access to Commissary had to be limited to prevent the spread of COVID-19. When inmates were unable to receive their OTC Medications from the Commissary, the Pharmacy provided these medications to the inmates without charge. Whenever inmates had access to the Commissary, the OTC Medications policy remained in full effect and inmates were required to purchase these medications from the Commissary.

46. To accommodate the limited Commissary availability, in September 2020, the purchase limit was increased from one package of 14-dose Omeprazole to two packages.

47. The Commissary monitors its inventory of all items, including Omeprazole, and places orders whenever current inventories are low.

48. The FCC Forrest City Commissary has had some issues with vendors running out of stock or not delivering Omeprazole on time. When the Commissary runs out of an OTC medication, it notifies the Pharmacy and Health Services, who will then provide the necessary medications to the inmates.

49. In April 2020, the Food and Drug Administration (FDA) recalled one of the most widely used, over-the-counter gastrointestinal acid medication, Ranitidine, commonly sold under the brand name Zantac. FDA News Release, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market* (Apr. 1, 2020), https://www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market. This resulted in significantly increased demand for similar antacid medicines, including Omeprazole, which contributed to the Commissary's difficulty receiving timely shipments from its vendors.

### IX. Inmate Gonzalez's COVID-19 History

50. There is an entry in inmate Gonzalez's medical records for an entry dated June 10, 2020, where there is a reference to "inmate Wright." It is reported to me that inmate Gonzalez presented the Court with an incomplete portion of this clinical encounter record. The excerpt inmate Gonzalez submitted to the Court is marked with a large, bold watermark directing the reader to "See Amendment." It is clear from the context that this was a scrivener's error. Attached is a complete copy of the record, which was amended on June 11, 2020, to correct the error in question. *See* Exhibit N, *Clinical Encounter* (June 10, 2020, as amended June 11, 2020).

51. As part of FCC Forrest City's Pandemic response, Health Services engaged in mass testing for COVID-19 for surveillance screening of the inmate population regardless of symptoms. Inmate Gonzalez was tested on May 13, 2020, and the CDC confirmed that the sample was positive for COVID-19 on May 29, 2020. *See* Exhibit O, *Admin. Note Lab Report & CDC Test Results* (May 29, 2020). While in isolation and COVID-19 quarantine, inmate Gonzalez was screened daily for COVID-19 symptoms, including temperature tests. The medical record shows that over the 14 consecutive days of daily screening, inmate Gonzalez denied symptoms and registered a temperature within normal range. *See* Exhibit P, *Vitals All* (May 21, 2020 – June 4, 2020). On June 10, 2020, it was noted that inmate Gonzalez had been without symptoms for over 14 days, and thus met the CDC guidelines for release from isolation. *See* Exhibit N. Based upon inmate Gonzalez's self-reporting at the time and the clinical indications through daily screening, inmate Gonzalez remained asymptomatic through his infection with COVID-19.

## X. Inmate Gonzalez's Medication History

52. In June 2020, inmate Gonzalez's prescription for Omeprazole was reviewed and it was determined that he fell under the OTC Medication policy and was required to purchase his own OTC medications with personal resources.

53. Since August 2020, inmate Gonzalez has purchased Omeprazole from the Commissary six times. *See* Exhibit Q, *Gonzalez Commissary Receipts*. As noted, inmate Gonzalez had the opportunity to purchase two packages of Omeprazole each time he went to the Commissary. But as is apparent from his receipts, inmate Gonzalez chose to purchase other items instead of purchasing a second package of Omeprazole.

54. As can be seen from the available balance notated on his Commissary receipts, inmate Gonzalez is not indigent.

55. Regarding his Methimazole prescription, it was discontinued on June 29, 2020 as laboratory results showed that it was not clinically indicated. *See* Exhibit R, *Clinical Encounter* (June 29, 2020). Follow-up labs were taken in October 2020, and the results were within normal ranges. His thyroid disorder condition was determined to be in remission. *See* Exhibit S, *Clinical Encounter* (Feb. 23, 2021). Labs will continue to be taken and if clinically indicated, he will be prescribed appropriate medication.

Executed on this 9th day of March, 2021.

*T. Hall, PhD.*
_____
Dr. Tanisha Hall
Associate Warden
Federal Bureau of Prisons
FCC Forrest City